No. 101,000

SUE O'BRIEN, Individually and on Behalf of a Class of Similarly Situated Individuals, *Appellants/Cross-appellees*, v. LEEGIN CREATIVE LEATHER PRODUCTS, INC., *Appellee/Cross-appellant*.

(277 P.3d 1062)

Opinion filed May 4, 2012.

*Robert W. Coykendall*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Will B. Wohlford* and *John W. Johnson*, of the same firm, were with him on the briefs for appellants/cross-appellees.

*James M. Armstrong*, of Foulston Siefkin LLP, of Wichita, argued the cause, and *Timothy B. Mustaine* and *Jeffrey A. Jordan*, of the same firm, were with him on the briefs for appellee/cross-appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, *Clay Britton*, assistant solicitor general, and *Lynette Bakker*, assistant attorney general, were on the brief for *amicus curiae* State of Kansas.

*Rex A. Sharp*, of Gunderson, Sharp & Walke L.L.P., of Prairie Village, was on the brief for *amicus curiae* Quin Jackson.

The opinion of the court was delivered by

BEIER, J.: This appeal and cross-appeal concern a dispute over retail pricing practices by a fashion accessories company.

Named plaintiff Sue O'Brien and a class of similarly situated consumers (O'Brien) sued the maker of Brighton handbags, other accessories, and luggage, defendant Leegin Creative Leather Products, Inc. (Brighton), alleging violations of the Kansas Restraint of Trade Act (KRTA), K.S.A. 50-101 *et seq*. We understand O'Brien to contend that Brighton's practices as a wholesale supplier and retailer constituted illegal price-fixing in violation of K.S.A. 50-101 and K.S.A. 50-112, entitling her and other class members to recovery under K.S.A. 50-108, K.S.A. 50-115, K.S.A. 50-147, and K.S.A. 50-161.

Brighton moved for summary judgment in the district court. In the alternative, it sought partial summary judgment and moved to decertify the class. District Judge Jeffrey E. Goering granted Brighton's motion for summary judgment, granted its motion for partial summary judgment in part, and did not reach the issue of decertification.

O'Brien appealed, and Brighton cross-appealed. We transferred this matter from our Court of Appeals on O'Brien's unopposed motion. We reverse and remand to the district court for further proceedings consistent with the rulings below.

## ISSUES

We have reformulated and reorganized the questions presented by the parties for ease and flow of analysis. The six questions are:

(1) Did the district judge correctly interpret the KRTA on the issue of "antitrust injury"?

(2) Did the district judge err in relying on a "rule of reason" to evaluate whether there has been a violation of the KRTA?

(3) Does this case involve a claim for horizontal price-fixing as well as vertical price-fixing, and, if so, was summary judgment on that claim properly granted by the district judge?

(4) Did the district judge identify the correct statute of limitations applicable to a treble damages claim and to a full consideration claim under the KRTA?

(5) Did the district judge correctly determine that an explicit written agreement with each retailer was not a necessary prerequisite to liability under the KRTA?

(6) Did the district judge properly evaluate predominance when granting class certification?

## INTRODUCTION

Before we set forth the pertinent factual and procedural background, a brief review of basic principles governing the relationship between Kansas and federal antitrust law and the types of price-fixing that can occur is in order.

Although there are federal antitrust statutes, *e.g.*, the Sherman Act, 15 U.S.C. § 1 (2006) *et seq.*, and a large body of interpreting

caselaw, antitrust law has traditionally been the province of the states. *McShares, Inc. v. Barry*, 266 Kan. 479, 488-89, 970 P.2d 1005, *cert. denied* 526 U.S. 1158 (1998) (citing *California v. ARC America Corp.*, 490 U.S. 93, 109 S. Ct. 166, 104 L. Ed. 2d 86 [1989]). In addition, we have noted in the past that federal antitrust law is intended to supplement the remedies available under Kansas law, not to replace Kansas antitrust provisions. 266 Kan. at 488-89.

Kansas' antitrust law under the KRTA, originally enacted in 1897, remains largely undeveloped; very few cases have reached this court. See *Bergstrom v. Noah*, 266 Kan. 829, 843, 974 P.2d 520 (1999). We have observed generally that the KRTA is broad in scope but that the bulk of its provisions have not been meaningfully interpreted by Kansas courts. 266 Kan. at 843.

While the KRTA and federal antitrust statutes share some similarities, they are not, in fact, the same. 266 Kan. at 844. Thus, "[w]hile . . . cases [interpreting federal antitrust statutes] may be persuasive authority for any state court interpreting its antitrust laws, such authority is not binding upon any court in Kansas interpreting Kansas antitrust laws." 266 Kan. at 845.

In relation to price-fixing practices specifically, this court concluded more than 50 years ago that it "may not substitute [its] judgment for that of the legislature as to whether price fixing is good or bad for the economic life of the state." *Quality Oil Co. v. du Pont & Co.*, 182 Kan. 488, 495, 322 P.2d 731 (1958). It is the role of the legislature, not this court, to set antitrust policy.

This case concerns allegations that defendant engaged in price-fixing. Price-fixing may be either "vertical" or "horizontal." Vertical price-fixing involves participants at different rungs of the distribution ladder, *e.g.*, a wholesaler and a retailer. Horizontal price-fixing involves participants who are at the same rung of the distribution ladder, *e.g.*, two or more retailers. See Black's Law Dictionary 1227-28 (8th ed. 2004).

## FACTUAL AND PROCEDURAL BACKGROUND

The bulk of the following facts are taken from District Judge Goering's findings of uncontroverted fact. Neither party challenges

these facts on this appeal, making them conclusive for our purposes. See *McShares, Inc.*, 266 Kan. at 480.

### Brighton's Business

Brighton is a designer, manufacturer, and retailer of fashion accessories and luggage. It primarily markets its accessories to independent retailers, but it also maintains retail stores of its own called "Brighton Collectibles." The first Brighton Collectibles store opened in 1999, and there are now more than 100 stores nationwide. A substantial portion of Brighton's profits come from its own retail stores.

### Brighton's Pricing Practices

Since April 1997, Brighton has provided its retailers with copies of its suggested pricing and promotional policy. Brighton's policy calls for retailers to sell Brighton products at "keystone," which is an amount equal to twice wholesale plus a small amount that varies by product. Under the policy, retailers may discount out-of-season products and products that are not selling well that the retailer will not reorder. Brighton ships its products to its retailers with tags displaying the manufacturer's suggested retail price (MSRP). For at least 1 year, Brighton required its retailers to initial and sign an acknowledgement that a violation of its pricing policy was grounds for dismissal.

According to Jerry Kohl, Brighton's owner and president, Brighton's pricing policy was not adopted to thwart competition from other manufacturers of similar products. When asked if he had thought about how the pricing policy affected the profitability of retail sales of the Brighton line, Kohl responded that he had not thought about it. Further, Laura Young, Brighton's second-in-command, said that prices were set without regard to retailers' profits. Brighton admits that its pricing policy was not created in response to any problem with retailers failing to provide desired service to customers. It has made certain of its decisions about its pricing policies after consulting with its retailers, such as when "birthday club" discounting was approved.

Many retailers of Brighton products have advertised discounts of Brighton products, but it is unclear which, if any, of these advertisements violated Brighton's pricing policy. Young stated in her affidavit:

"Since the promulgation of the universal retail price policy, Brighton has never undertaken any systematic, comprehensive effort aimed at determining whether its retailers are following that policy. But Brighton from time to time has acquired information from various sources (*e.g.*, consumers, other retailers, advertisements, and Brighton's sales force), to the effect that some Brighton retailers are or might be violating the suggested retail price policy, and Brighton has occasionally enforced that policy against retailers in states other than Kansas by refusing to deal with retailers believed to have intentionally violated Brighton's policy."

Kohl also testified in his deposition that Brighton sometimes becomes aware of retailers selling products at prices other than the MSRP. Kohl further testified that Brighton keeps reports documenting customer inquiries, including those about Brighton's pricing policies. Kohl testified:

"Q: . . . And one of the things you do with the reports is keeping [*sic*] track of whether or not the particular retailer is complying with the pricing policy of [Brighton]?

"A: Well, that's a big stretch. I surely wouldn't call it that. We keep comments regardless of what they might be, everything from talk to Joe about a handbag was damaged. So we keep comments that people give us.

"Q: Those comments include whether or not the retail customer of [Brighton]'s is discounting or is not following the pricing policy; is that a fair statement?

"A: Well, again, I wouldn't put it the way you did. You know, there are times when there's comments about pricing policies, but to say they include them implies that it's a regular situation. And the answer is no, it isn't.

"Q: Well, if a retailer was abiding by the pricing policy, there wouldn't be any need to put information like that in an inquiry report.

"A: That's correct.

"Q: And your point is most of the retailers comply with the retail pricing policies of [Brighton]?

"A: As far as I know, yes.

"Q: And those who don't, when you find out about it, are terminated, correct?

"A: Those who don't and who are aware of our pricing policy and is [*sic*] willfully disregarding our pricing policy, yes, they are terminated or I should say put on hold until we make a decision on what we're going to do."

In the past, Brighton has rejected at least one promotion for violating its retail price maintenance policy. When rejecting the promotion, a proposed shoe trade-in, Young stated in an email:

". . . . Did someone tell you it was ok to do this?

"The reason I ask is this will spread like cancer . . . one person does it . . . sells more shoes than normal. And they and you tell more people and before you know it the world will be holding their own shoe trade in.

"It cannot be an individual store authorize [*sic*] event. We have a very clear SRP (Suggested Retail Pricing Policy) and this would be in violation of it. . . .

"SO, please no matter what/who said its ok, it's not."

Young also expressed the following in another email:

"[W]hen one store begins to lure customers in with an incentive for purchasing . . . the next store thinks they need to 'one up' the competition, and then the third customer needs to 'two up them both' and so on . . . and after a while it's out of control. What happens is the customers then get confused on if they need to wait for the best offer to purchase Brighton.

"Our Suggested Retail Pricing and Promotional Policy basically was designed to create an environment for the consumer to shop with confidence that they were being treated fairly. We have always wanted consumers to be able to feel that wherever Brighton is sold—authorized dealers—they can buy now! And not worry if they're getting the 'best deal.' "

One of O'Brien's experts was Gregory T. Gundlach, Professor of Marketing and Senior Fellow at the American Antitrust Institute. He asserted in his prepared report that there was no evidence that a cartel existed among Brighton's retailers in Kansas or elsewhere and that there was no evidence that Brighton's pricing policy was instituted by Brighton at the request of its retailers. Gundlach also concluded, however, that Brighton engaged in vertical price-fixing and in horizontal price-fixing. Gundlach further concluded that Brighton's price-fixing necessarily raised the price at which consumers may purchase its products. In addition, Gundlach concluded that Brighton's price-fixing limited price competition between retailers and that, as a result of the suppression of competition, consumers were denied potential savings.

Gundlach also opined that the higher prices faced by consumers were not offset by benefits to competition or to consumers, stating that no facts supported various theories advanced by Brighton's experts to support a pro-competitive explanation of the company's price-fixing. According to him, the more compelling scenario was that Brighton's price-fixing shielded its own stores and those of its

retailers from competition by more efficient forms of retailing to the detriment of consumers.

Christopher Charles Pflaum, Ph.D., an economist specializing in business and financial economics and the other expert for the plaintiff class, testified about class certification and the measure of damages.

*Brighton's Heart Store and Luggage Applications*

Since 1998, Brighton has offered a "Heart Store" program to retailers, which offers incentives for retailers to expand their business with Brighton. In exchange for these incentives, Heart Stores are expected to maintain certain levels of Brighton inventory, to display Brighton products in a dedicated section of the store, and to service Brighton products regardless of where they were purchased.

A retailer becomes a Heart Store by signing an application, which is then approved by Brighton. Less than 5 percent of Brighton's retailers are Heart Stores.

Applications for Heart Store status must be submitted each calendar year. The Heart Store applications for the years 2001 and 2002 included language that the applicant would maintain minimum inventory, showcase Brighton products in dedicated spaces, "[s]ell Brighton products for the suggested price every day, 365 days a year," and "close out markdown styles you do not plan to reorder." The Heart Store applications for 2003 and later do not include that language, but they do include a statement that "Brighton reserves the right to withdraw Heart Store benefits from any store that does not represent Brighton in a positive and quality manner."

To sell Brighton luggage, a separate agreement must be signed by the retailer. As with the Heart Stores, a retailer must apply to become a Brighton luggage retailer. Luggage retailers must maintain a certain inventory of products. About 5 percent of Brighton retailers sell Brighton luggage.

The application to sell Brighton luggage for calendar year 2003 included language that the applicant agreed to display a certain number of pieces and agreed to "sell the luggage at the suggested

retail price." The luggage applications for prior and subsequent years did not include such language.

Brighton never made any express or explicit promise to enforce its retail pricing policy against other Brighton retailers as an incentive for a retailer to become a Heart Store or luggage store.

### Brighton in Kansas

In the relevant time period for this lawsuit, after April 12, 2001, Brighton has sold to more than 100 independent retailers in Kansas. Most of Brighton's retailers in the state are small boutiques or specialty stores, but Brighton also sells to certain department stores and specialty chains. The independent retailers typically carry products from both Brighton and other brands. There is only one Brighton Collectibles store in Kansas; it opened in December 2006.

O'Brien, the class representative, testified that she owns numerous other brands of accessories and that she made purchases of these accessories in both department stores and specialty stores. O'Brien testified that she shops in all different types of retail establishments.

Several of Brighton's Kansas retailers have sworn that they generally sell at the MSRP and do not discount unless an item is out of season or selling poorly. Further, the retailers swore that this is true for both Brighton and non-Brighton products.

Ten Brighton retailers in Kansas who submitted affidavits in this case have sworn that they generally price products at keystone. These retailers also swore that their pricing of Brighton products would have been the same in the absence of Brighton's pricing policy. Four Kansas Brighton retailers have stated in affidavits that they voluntarily follow Brighton's pricing policies and that they had no agreement with Brighton to sell Brighton products at the suggested retail price.

Since adopting its pricing policy, Brighton has not determined that any Kansas retailer violated the policy and has not refused to deal with or taken other adverse action against any Kansas retailer for an actual or suspected violation. However, Brighton did follow up on a report that one of its Kansas retailers may have been dis-

counting. It concluded that the reported discounting had not occurred.

Six independent retailers in Kansas submitted Heart Store applications for the years 2001 and 2002, and Brighton accepted the six as Heart Stores for those years. Three Kansas Heart Stores, as well as three other Brighton Kansas retailers, submitted luggage applications for 2003 and were accepted as luggage stores for that year.

*The Accessories Market*

Products of a quality and price similar to Brighton's are sold in department stores, specialty chains, and over the Internet. According to figures arrived at by using Accessories magazine, an industry trade publication relied on by the experts on both sides, the value of retail sales of Brighton's products in 2005 was approximately $357 million. Accessories magazine reports that the total amount of retail sales in the accessories industry in 2005 was $30.2 billion. Based on these figures, Brighton's sales accounted for less than 2 percent of total sales in the accessories market in 2005. Accessories magazine also reported that 2005 retail sales of accessories in specialty boutiques totaled $4.1 billion. If all of Brighton's sales had occurred in specialty boutiques, which was not the case, Brighton's retail sales would constitute 6.2 percent of the sales in specialty boutiques in 2005. From 2001 to 2004, Brighton's estimated sales as a percentage of retail sales were in the 1 percent to 2 percent range; and Brighton's estimated sales as a percentage of specialty boutique sales were in the 5 percent to 7 percent range.

Gundlach drew conclusions about the relevant market and Brighton's market dominance. He defined the relevant market for this case as women's accessories distributed through specialty boutique dealers. He further defined boutique retailers as those who generally are independent and provide an intimate experience for shoppers. Gundlach recognized that Brighton seeks to focus its retail distribution on small, independent specialty retailers or boutique retailers. He also determined that the specific characteristics of consumers who shop often in boutique retail outlets are important to understanding whether products generally distributed

through boutique retailers compete with products not distributed through boutique retailers. Gundlach concluded that these characteristics are important in defining the market in this case. In addition to his analysis of the relevant market, Gundlach also concluded that Brighton was the dominant vendor in women's accessories distributed through specialty boutique retailers. He stated that Brighton's dominant power was derived from its extensive retail distribution network, its broad product lines, and its differentiated product.

*This Lawsuit*

The class in this case consists of named plaintiff O'Brien and "[a]ll persons who, in the period from January 1, 1997, . . . to the date of trial, have purchased any Brighton product from any Brighton retailer."

In the petition that launched this litigation, an earlier named plaintiff alleged that Brighton engaged in pricing practices prohibited by K.S.A. 50-101, K.S.A. 50-102, and K.S.A. 50-112. Specifically, plaintiff alleged that "[t]he arrangements made between [Brighton] and its retailer dealers are made with the purpose of controlling the price of Brighton goods to the customer, and are prohibited trust arrangements outlawed in Kansas."

Plaintiff further alleged that plaintiff and the class were entitled to damages pursuant to K.S.A. 50-108, K.S.A. 50-137, and K.S.A. 50-161, including full consideration damages, treble damages, and attorneys fees and costs. We note that the statutory citations on damages appear to be in error in two respects. First, K.S.A. 50-115 is omitted, even though it is the support for the full consideration claim. Second, K.S.A. 50-137 does not apply, as it deals exclusively with unlawful restraints by grain dealers. It is obvious that the citation was intended to be K.S.A. 50-147 instead. Neither of these errors appears to have confused the parties, so we will address the class damages claims on this appeal as though the petition's citation errors did not occur.

The district judge held that O'Brien's claims that Brighton's resale price maintenance (RPM) agreements and RPM policy violate the KRTA were to be evaluated under a "rule of reason" frame-

work. The district judge cited both K.S.A. 50-101 and K.S.A. 50-112 in this portion of his summary judgment decision, but he failed to address the statutory language in either statute or any potential differences between the two provisions. Although the district judge ruled that genuine issues of material fact remained on whether Brighton's RPM policy or agreements were unreasonable, the district judge also ruled that O'Brien would be unable to prove antitrust injury. The judge therefore granted Brighton's summary judgment motion.

Judge Goering also determined that O'Brien did not make out a claim of horizontal price-fixing. District Judge William Sioux Woolley held that O'Brien's claim for treble damages was subject to a 1-year statute of limitations, while O'Brien's full consideration claim was subject to a 3-year statute of limitations. Judge Goering did not reach Brighton's motion to decertify the class.

On this appeal by O'Brien and cross-appeal by Brighton, in addition to the parties' briefs, we have received and reviewed *amici* briefs from the State of Kansas and from Quin Jackson, a plaintiff in a separate Kansas antitrust class action. Brighton submitted briefs responding to the *amici* briefs, which we have also considered.

## DISCUSSION

Three standards of appellate review are influential in this case. First is our familiar standard for summary judgment:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

We have also emphasized that " ' "[s]ummary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial." ' [Citations omitted.]" *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008).

The second relevant standard of review affects interpretation of statutes, such as the KRTA. Statutory interpretation raises a question of law over which this court has unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). The most fundamental rule is that the intent of the legislature governs if that intent can be ascertained. 290 Kan. at 47. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009).

"When a statute is plain and unambiguous, we must give effect to its express language, rather than determine what the law should or should not be. We will not speculate on the legislative intent and will not read the statute to add something not readily found in it. If the statute's language is clear, there is no need to resort to statutory construction. [Citations omitted.]" *Graham v. Dokter Trucking Group*, 284 Kan. 547, 554, 161 P.3d 695 (2007).

Only if the statute's language or text is unclear or ambiguous does the court employ canons of construction, legislative history, or other background considerations to divine the legislature's intent and construe the statute accordingly. *State v. Trautloff*, 289 Kan. 793, 796, 217 P.3d 15 (2009).

Our third relevant standard of review applies to questions about class action certification:

" 'Trial judges are afforded substantial discretion in determining whether a class should be certified.' [Citation omitted.] . . . " '[T]he amount and degree of judicial discretion will vary depending on the character of the question presented for determination.' " [Citations omitted.] . . . In general, when a discretionary decision is made within the legal standards and takes the proper factors into account in the proper way, the [trial court's] decision is protected even if not wise. [Citation omitted.] . . . However, 'abuse is found when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination.' [Citations omitted.]" *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 779, 89 P.3d 908 (2004).

"While the trial court has substantial discretion in determining whether a class should be certified, the provisions of K.S.A . . . 60-223 must be applied and rigorously analyzed." 277 Kan. at 780. In conducting its analysis, the trial court "should consider evidence when submitted by the parties and make those factual determinations necessary to a determination of whether the prerequisites for a class action are met." 277 Kan. at 783. "[T]he presence of individual questions, while tending to diminish the weight of class facts, does not necessarily defeat a prima facie showing the class prerequisites are satisfied, [citation omitted,] or mean that there has been an abuse of discretion in certifying the class. [Citation omitted.]" 277 Kan. at 793.

### KRTA Provisions

K.S.A. 50-101, one of the KRTA sections setting out elements of O'Brien's cause of action, provides in pertinent part:

"A trust is a combination of capital, skill, or acts, by two or more persons, for either, any or all of the following purposes:

. . . .

"*Second.* To increase or reduce the price of merchandise, produce or commodities, or to control the cost or rates of insurance.

. . . .

"*Fourth.* To fix any standard or figure, whereby such person's price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state.

"*Fifth.* To make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which such person shall: (a) Bind or have to bind themselves not to sell, manufacture, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure;

(b) agree in any manner to keep the price of such article, commodity or transportation at a fixed or graded figure;

(c) in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or others in transportation, sale or manufacture of any such article or commodity; or

(d) agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity, that such person's price in any manner is affected. Any such combinations are hereby declared to be against public policy, unlawful and void."

K.S.A. 50-102 denies "[a]ll persons within this state" the right to form "or be in any manner interested, either directly or indirectly, as principal, agent, representative, consignee or otherwise," in any trust as defined in K.S.A. 50-101.

K.S.A. 50-112, the KRTA section setting out elements of what appears to be O'Brien's alternative statutory cause of action, provides in pertinent part:

"All arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, or in the product, manufacture or sale of articles of domestic growth or product of domestic raw material, . . . , and all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles, . . ., are hereby declared to be against public policy, unlawful and void."

K.S.A. 50-108 provides for a private right of action against those who violate K.S.A. 50-101 and K.S.A. 50-102:

"[A]ny person that may be damaged by any such agreement, trusts or combinations described in K.S.A. 50-101 and 50-102, and amendments thereto, may sue for and recover in any court of competent jurisdiction in this state, of any person operating such trust or combination, such damages sustained, together with reasonable attorney fees."

K.S.A. 50-115 does likewise but applies to K.S.A. 50-112:

"[A]ny person injured or damaged by any such arrangement, contract, agreement, trust or combination, described in K.S.A. 50-112 and 50-113, and amendments thereto, may sue for and recover in any court of competent jurisdiction in this state, of any person, the full consideration or sum paid by such person for any goods, wares, merchandise and articles included in or advanced or controlled in price by such combination . . . ."

K.S.A. 50-147 speaks to the cumulative nature of rights and remedies under the KRTA:

"The rights and remedies given by this act shall be construed as cumulative of all other laws in force in this state, and shall not affect, change or repeal any other remedies or rights now existing in this state for the enforcement, payment or collection of fines, penalties and forfeitures."

K.S.A. 50-161 defines certain terms, again authorizes a private right of action, and discusses remedies:

"(a) As used in this section, the term 'person' means any individual, corporation, partnership, firm, company or other association of persons . . . .

"(b) . . . [A]ny person who may be damaged or injured by any agreement, monopoly, trust, conspiracy or combination which is declared unlawful by any of the acts contained in chapter 50 of the Kansas Statutes Annotated, relating to unlawful acts, agreements, monopolies, trusts, conspiracies or combinations in restraint of trade, shall have a cause of action against any person causing such damage or injury. Such action may be brought by any person who is injured in such person's business or property by reason of anything forbidden or declared unlawful by this act, regardless of whether such injured person dealt directly or indirectly with the defendant. The plaintiff in any action commenced hereunder in the district court of the county wherein such plaintiff resides, or the district court of the county of the defendant's principal place of business, may sue for and recover treble the damages sustained. In addition, any person who is threatened with injury or additional injury by reason of any person's violation of such acts may commence an action in such district court to enjoin any such violation, and any damages suffered may be sued for and recovered in the same action in addition to injunctive relief . . . .

"(c) . . . The remedies provided herein shall be alternative and in addition to any other remedies now provided by law."

*Antitrust Injury*

In this case, the district judge concluded that O'Brien was vulnerable to summary judgment in favor of Brighton because "[p]laintiff has to have some concrete evidence that she personally paid higher prices for Brighton products as a result of Defendant's RPM Policy" and, viewing the evidence in the record in the light most favorable to O'Brien, "[p]laintiff has not demonstrated that she paid higher prices for the Defendant's products than she would have paid absent Defendant's RPM policy." Thus, in the district judge's view, O'Brien was unable to prove "antitrust injury."

The concept of antitrust injury invoked in the district court comes from federal antitrust jurisprudence. See, *e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."). Essentially, it equates to the Kansas con-

cept of causation, or the "require[ment] that a plaintiff's theory of damages . . . correspond to an economic effect that the statute or case law rule invoked as the basis for liability aims to prevent." See Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697, 698 (2003).

Under the plain language of K.S.A. 50-101, there are several optional theories under which a KRTA plaintiff may proceed. Under the most forgiving of those theories, a plaintiff must prove the existence of a trust "for . . . the . . . purpose[]" [t]o fix any standard or figure, whereby . . . price to the public shall be, in any manner, controlled or established." K.S.A. 50-101 *Fourth*. As defined in K.S.A. 50-101, to establish the existence of a trust, a plaintiff need only show a "combination of capital, skill, or acts, by two or more persons." A plaintiff need not show a relationship rising to the level of an agreement. Furthermore; it is enough to demonstrate that the combination is "for the . . . purpose[] . . . [t]o fix prices; a plaintiff does not have to show that the combination actually succeeds in increasing prices. "For the purpose" contemplates a subjective standard, one that requires examination of the intent behind a defendant's behavior.

Under the plain language of K.S.A. 50-112, there are alternate theories under which a KRTA plaintiff may proceed: A plaintiff may prove the existence of an arrangement, contract, agreement, trust, or combination "designed to" advance, reduce, or control price, or one that "tend[s] to" advance, reduce, or control price. Mere arrangements between persons are within the scope of the statute; again, a plaintiff does not have to show a relationship rising to the level of an agreement. In addition, it is enough to show that the arrangement is "designed to" or "tends to" control prices; again, a plaintiff does not have to show that the arrangement actually succeeds in increasing prices. Like "for the purpose" in K.S.A. 50-101, the phrase "designed to" contemplates a subjective standard. On the other hand, "tend to" contemplates an objective standard, one that requires examination of the defendant's behavior to discern whether it would reasonably be expected to produce a particular result, regardless of the defendant's intention.

In addition, under the plain language of K.S.A. 50-108, K.S.A. 50-115, and K.S.A. 50-161, a plaintiff must show that the plaintiff was injured or damaged by the defendant's forbidden behavior.

The language in Brighton's pricing policy and written Heart Store and luggage store applications and agreements is probative on whether Brighton's pricing policy and pricing agreements were for the purpose of fixing prices or designed to control prices and on whether they tended to control prices.

Brighton's 1997 "Brighton Retail Pricing and Promotional Policy" sets the "Suggested Brighton Retail Pricing" for each Brighton product. Although limited discounting is permitted by the policy for items that will not sell and that the retailer will not reorder, the policy explicitly states that Brighton "stand[s] firm on [its] Suggested Retail Prices" and that "[e]xceptions are not favored, should not be assumed, and will be granted only in extraordinary circumstances as determined independently by Brighton." The policy also states that "[c]onsumers are confused by the ever popular sale, sale, sale, etc.," *i.e.*, discounting by retailers, and that one purpose of the policy is to seek to reassure customers that prices are always "consistent." Pricing policies promulgated for subsequent years are nearly identical.

The language of Brighton's pricing policy certainly is subject to an inference that it was for the purpose of fixing prices and was designed to and tended to control the prices of Brighton's goods. While some discounting is allowed under the policy, it is permitted only under terms set by Brighton. Moreover, discounting is intended to be the exception rather than the rule, and discounting approval must be granted in advance by Brighton. Ensuring that prices are the same each day and at each store where Brighton goods are sold is a part of Brighton's business strategy to build consumer confidence by letting the customers know that they do not need to hunt for deals.

Further, for the relevant years of 2001 and 2002, Brighton's Heart Store applications included an explicit agreement between Brighton and its retailers that retailers agree to "[s]ell Brighton products for the suggested price every day, 365 days a year." The Heart Store agreements also allowed retailers to close out styles

they would not reorder, but advertising of such closeouts was not permitted. No other discounting appears to have been permissible under the Heart Store agreements.

The 2003 luggage application is similar. It required the same agreement by retailers to sell at the price suggested by Brighton, stating that applicants "also agree that you will sell the luggage at the suggested retail price." The luggage agreement did not appear to allow for any discounting.

Both Heart Store and luggage store applications required applicants' signatures.

The Heart Store and luggage applications explicitly required retailers who wished to qualify for Heart Store or luggage store status to sell Brighton products at the same amount each and every day. The language of the agreements gives an even stronger indication that they were "for . . . the . . . purpose[] . . .[t]o fix any standard or figure, whereby . . . price to the public shall be, in any manner, controlled or established," "designed to . . . control the price or the cost . . . to the consumer of any such products or articles," and would "tend to advance, reduce or control the price or the cost to the . . . consumer" by explicitly limiting discounting.

Evidence of Brighton's enforcement practices also is relevant to Brighton's subjective intention, intention logically necessary if the plaintiff's theory is that Brighton's arrangements were "for . . . the . . . purpose[]" or "designed to" fix prices. O'Brien came forward with probative evidence of Brighton's enforcement of its pricing policy.

Although Brighton insisted that it has "never undertaken any systematic, comprehensive effort aimed at determining whether its retailers are following th[e] [suggested retail price] policy," it does maintain a file titled "Pending Pricing Issues," in which it keeps complaints from retailers and customers, as well as advertisements offering discounts of Brighton products. In addition, it maintained a specific file on a particular Kansas retailer. It contains one entry stating that Brighton received a tip on the retailer's discounting and a later entry stating that, after a Brighton representative visited the store, it determined that no discounting was occurring. Also, logs produced by Brighton show a notation that one of Brighton's

Kansas retailers reported another for discounting; the log also shows that a Brighton representative would be notified of the report.

In addition to tracking potential violations, Brighton's management actively discouraged departures from Brighton's pricing policy and pricing agreements. On this point, Young emphatically rejected a retailer's proposed promotional event, reminding the retailer of the pricing policy and stating that the rejected promotion was to be avoided because it would "spread like cancer." Kohl said that Brighton would rather retailers not pursue such promotions because "the other retailers in the area feel they have to compete and before long [it's] chaos." Kohl also said that "[t]hose who don't [follow the pricing policies] and who are aware of our pricing policy . . . are terminated."

The above-described evidence of Brighton's enforcement practices is circumstantial support for O'Brien's assertion that Brighton's written pricing policy and written pricing agreements were "for. . . the . . . purpose[]" or "designed to" at least control, if not advance, the prices at which defendant's products were sold to consumers and that they "tend[ed] to" do the same. If controlling prices was not at least part of Brighton's intent, then enforcement would be unnecessary.

It is true that Brighton attempted to counter O'Brien's evidence on purpose or design and tendency with testimony from certain Kansas retailers who would charge the same price for Brighton products regardless of Brighton's pricing policy. But such evidence makes summary judgment less appropriate, not more. It translates to the existence of a genuine issue of material fact on a dispositive issue—here, one of the essential components of O'Brien's cause of action.

To avoid summary judgment, however, O'Brien must also come forward with evidence that the class has been injured or damaged by Brighton's pricing combination or arrangement. See K.S.A. 50-108 ("damaged"); K.S.A. 50-115 ("injured or damaged"); K.S.A. 50-161 ("damaged or injured").

The district judge followed Brighton's lead and established a "concrete evidence" standard for injury, requiring O'Brien to prove

actual Brighton consumer purchases at prices higher than they would have been absent Brighton's unlawful pricing practices. Again, the district judge based his decision on federal law.

The district judge cited federal antitrust cases for the proposition that market studies are the proper bases for determining whether prices have been higher because of a defendant's alleged violation of the antitrust laws. See *American Seed Co., Inc. v. Monsanto Co.*, 238 F.R.D. 394, 400 (D. Del. 2006); *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136, 144 (D. N.J. 2002); *In re Aluminum Phosphide Antitrust Litigation*, 905 F. Supp. 1457, 1462 (D. Kan. 1995). The federal cases strongly favor this approach, although they appear to stop short of stating that a market study is the *only* way to demonstrate a difference in prices. See, *e.g., In re Aluminum Phosphide Antitrust Litigation*, 905 F. Supp. at 1462 ("In order for plaintiffs to make a submissible case on damages, they must provide evidence which would allow the jury to compare actual prices during the conspiracy period with reasonably estimated prices that would have prevailed during that same period, absent the conspiracy."); Proving Antitrust Damages: Legal and Economic Issues, Section of Antitrust Law, American Bar Association, pp. 31-39 (1996).

Brighton argued, in particular, for use of what is known as a "benchmark analysis" under federal law, positing that this was the only way O'Brien could show cognizable injury. Under this approach, O'Brien would have needed: (1) to conduct a benchmark analysis comparing the actual retail prices of Brighton products before and after Brighton allegedly crossed the line between a lawful pricing policy and unlawful pricing agreements, (2) to compare the prices of Brighton accessories against the prices of similar accessories from manufacturers who did not impose price restraints, or (3) to collect affidavits from Kansas retailers who were prevented from discounting. In Brighton's view, the methodology and opinion of Gundlach, based on academic theory and economic literature rather than an empirical analysis of the Kansas market, was not a suitable substitute. In addition, O'Brien's other expert, Pflaum, was inadequate because he was "asked to simply assume the fact of injury" in order to calculate damages. This same expert admitted

that, absent defendant's conduct, "there could be [the] possibility" that prices would increase and some class members might have paid more, and it was not his testimony that every Brighton retailer would lower prices. Brighton also relied upon its affidavits from certain Brighton retailers in Kansas who swore that their pricing practices would be the same absent Brighton's policy.

O'Brien argued to this court that the language of Brighton's written pricing policy, its written pricing agreements, and its enforcement practices—plus the testimony of Gundlach—created a genuine issue of material fact on injury and thus precluded summary judgment. Gundlach opined that Brighton's practices fixed the prices of Brighton's products, which severely limited discounting, and he observed that retailers who willfully failed to comply with the pricing arrangement were terminated or their shipments put on hold. He further concluded that, as a result, Brighton's price-fixing limited price competition by retailers selling Brighton goods. Gundlach based his conclusions on information from Brighton regarding its practices, a survey of "authoritative opinion" on the effects of vertical price-fixing in general, and "empirical evidence" of the impact of price-fixing documented by other scholars, studies that were not specific to Brighton.

Brighton's demand that O'Brien come forward with proof of injury or damage in the form of a benchmark analysis sets too high a bar. It over-interprets federal law, which, at best, is persuasive rather than controlling. It also is contrary to this court's usual posture of hospitality to circumstantial evidence. See *Dieker v. Case Corp.*, 276 Kan. 141, 160, 73 P.3d 133 (2003) (circumstantial evidence can serve as proof of the elements of a theory of liability even though other reasonable theories are not excluded by such evidence). Neither the KRTA nor our limited caselaw interpreting it, see, *e.g.*, *Bergstrom v. Noah*, 266 Kan. 829, 974 P.2d 520 (1999); *United Artists Corp. v. Mills*, 135 Kan. 655, 11 P.2d 1025 (1932); *Mills v. Ordnance Co.*, 113 Kan. 479, 215 P. 314 (1923); requires this particular form of "concrete evidence" to avoid summary judgment on antitrust injury. O'Brien has directed the court's attention to adequate circumstantial evidence that consumers actually paid prices for Brighton goods inflated by its pricing combinations or

arrangements with retailers, and the district judge erred in ruling otherwise. Summary judgment in favor of Brighton based on the nonexistence of "antitrust injury" as a matter of law must be reversed.

*"Rule of Reason" Violation Standard*

Brighton's next line of defense—raised as a contingent issue in the appeal of the plaintiff class—is its insistence that only price-fixing that violates a "rule of reason" can subject it to liability under the KRTA. In essence, Brighton argues that the district judge's decision to grant it summary judgment can be upheld as right for the wrong reason. See, *e.g., State v. Robinson,* 293 Kan. 1002, 1025, 270 P.3d 1183 (2012). We must therefore reach the merits of this issue.

As with the issue of antitrust injury, Brighton references federal law, in particular, the United States Supreme Court's employment of "rule of reason" analysis in an earlier case involving at least some of the same pricing practices at issue here, *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007).

In *Leegin,* a case brought under the Sherman Act, 15 U.S.C. 1 *et seq.,* by PSKS, Inc., operator of Kay's Kloset, a Texas women's apparel store, the Court stated that the goal of the required federal rule of reason is to distinguish between "restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." 551 U.S. at 886.

The district judge in this case followed Brighton half as far as it would have had him go. He accepted Brighton's argument that reasonableness or a rule of reason sets the standard for violation of the KRTA, invoking language in two Kansas restraint-of-trade cases: *Heckard v. Park,* 164 Kan. 216, 223-24, 188 P.2d 926 (1948) ("The real question is never whether there is any restraint of trade but always whether the restraint is reasonable in view of all the facts and circumstances and whether it is inimical to the public welfare."), and *Okerberg v. Crable,* 185 Kan. 211, 217, 341 P.2d 966 (1959) (quoting same language from *Heckard).* But he stopped

short of granting summary judgment on this issue to Brighton because he believed there were genuine issues of material fact on whether Brighton's pricing policies could pass muster under a reasonableness standard. Brighton challenges this part of the district judge's ruling on its cross-appeal—arguing that O'Brien cannot show that it had market power within a properly defined market or that its pricing practices had anticompetitive effects. We need reach these cross-appeal issues only if we first agree with the district judge's decision that reasonableness sets the standard for when price-fixing violates the KRTA.

Neither K.S.A. 50-101 nor K.S.A. 50-112 mentions reasonableness or a rule of reason. Rather, K.S.A. 50-101(d) provides that "[a]ny such combinations are hereby declared to be against public policy, unlawful and void," (emphasis added) and K.S.A. 50-102 denies "the right to form or to be in any manner interested, either directly or indirectly, as principal, agent, representative, consignee or otherwise, in any trust as defined in K.S.A. 50-101. K.S.A. 50-112 provides that "[a]ll arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles . . . are hereby declared to be against public policy, unlawful and void." (Emphasis added.)

This clear statutory language draws a bright line. The question is therefore whether *Heckard* and *Okerberg* or federal antitrust rulings invoking a rule of reason compel its erosion.

We address the federal antitrust rulings first and briefly: We conclude that they compel nothing. O'Brien is correct in arguing that federal precedents interpreting, construing, and applying federal statutes have little or no precedential weight when the task is interpretation and application of a clear and dissimilar Kansas statute. See *Bergstrom*, 266 Kan. at 845 (Kansas courts not bound by federal approach in interpreting antitrust laws); see also *State v. Sellers*, 292 Kan. 117, 128, 253 P.3d 20 (2011) (court will give effect to plain language of unambiguous statute); *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009) (court must first attempt to ascertain legislative intent through statutory language enacted, giv-

ing common words ordinary meanings); *Graham v. Dokter Trucking Group*, 284 Kan. 547, 554, 161 P.3d 695 (2007) ("If the statute's language is clear, there is no need to resort to statutory construction."). Brighton's scholarly exegesis on the holdings and reasoning of federal cases, though impressive, is inapposite.

Pronouncements in our Kansas precedents are another matter. Although stare decisis is not an "inexorable command," see *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 787, 189 P.3d 508 (2008) (doctrine of stare decisis does not compel perpetuation of incorrect analysis of the law); see also *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 610, 214 P.3d 676 (2009) (citing *Coleman v. Swift-Eckrich*, 281 Kan. 381, 388, 130 P.3d 111 [2006] ["This court is not inexorably bound by precedent; it will reject rules that were originally erroneous or are no longer sound."]), we do not lightly overrule this court's prior cases. See *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 (2010) (court of last resort will follow rule of law established in earlier cases unless clearly convinced rule was originally erroneous, no longer sound because of changing conditions, more good than harm will come by departing from precedent). Thus it is necessary for us to conduct a careful examination of the development of the antitrust violation standard in Kansas to discern whether any reasonableness gloss that has been read into the KRTA is first, sound, and, second, applicable to the vertical or horizontal price-fixing claims here.

The first case to address vertical price-fixing in our state was 1923's *Mills v. Ordnance Co.*, 113 Kan. 479. In that case, this court considered a contract for the purchase of tractors that required the purchaser to maintain the seller's list prices when reselling the tractors to consumers. This qualified as a vertical price-fixing agreement, although the opinion did not use that description. At the time, the governing provision was Section 6409 of the General Statutes of 1915, the legislative ancestor of today's K.S.A. 50-101. Section 6409 provided in part:

"A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes:

. . . .

"*Fifth*, To make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which they shall bind or have to bind themselves not to sell, manufacture, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure; or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graded figure; or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or others in transportation, sale or manufacture of any such article or commodity; or by which they shall agree *to pool, combine or unite any interest they may* have in connection with the manufacture, sale or transportation of any such article or commodity, that its price may in any manner be affected. And any such combinations are hereby declared to be against public policy, unlawful and void." (L. 1897, ch. 265, sec. 1.)

This court held that the tractors purchase contract violated Section 6409 and was therefore unenforceable:

"[The parties] tried to have the contract apply to a restricted territory and apparently attempted to give to the plaintiff the exclusive right to sell tractors in that territory. In doing so, the parties fixed the price at which the tractors should be sold by the plaintiff after they had been purchased from the defendant. They could not make such a contract because it violated the law of this state." *Mills*, 113 Kan. at 481.

Nine years later, this court decided *United Artists Corp. v. Mills*, 135 Kan. 655, another vertical price-fixing case. By that time, the Revised Statutes of 1923 had replaced the General Statutes of 1915, see *State, ex rel., v. Davis, Governor*, 116 Kan. 663, 229 P. 757 (1924); and R.S. 1923, 50-101, the predecessor to today's K.S.A. 50-101, precisely mirrored Section 6409, as quoted above.

This court examined a contract between a photoplay distributor and exhibitor, which included a provision requiring the exhibitor to charge a minimum admission fee to customers, and concluded that the provision "plainly . . . violate[d] the inhibition against price[-]fixing contained in . . . R.S. 50-101." *United Artists Corp.*, 135 Kan. at 656.

In 1936, this court again refused to enforce a contract that included a vertical price-fixing agreement, this time concerning ice, in *Joslin v. Steffen Ice & Ice Cream Co.*, 143 Kan. 409, 54 P.2d

941 (1936). Again, we relied on R.S. 1923, 50-101, as well as R.S. 1923, 50-112, which provided that

"all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, or in the product, manufacture or sale of articles of domestic growth or product of domestic raw material, or for the loan or use of money, or to fix attorneys' or doctors' fees, and all arrangements, contracts, agreements, trusts or combinations between persons or corporations, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles, or to control the cost or rate of insurance, or which tend to advance or control the rate of interest for the loan or use of money to the borrower, or any other services, are hereby declared to be against public policy, unlawful and void." (L. 1889, ch. 257, sec. 1.)

We concluded: "A manufacturer of ice may fix the price at which he may sell his product, but the law will not permit him and his buyer to agree as to the price the latter will charge when he in turn sells that product to third parties." 143 Kan. at 411. The vertical price-fixing arrangement in the ice contract was "in plain violation" of the statutes. 143 Kan. at 411-12 (citing *Mills*, 143 Kan. at 481).

The following year, the legislature enacted the Kansas Fair Trade Act (KFTA), R.S. 1937, 50-301 *et seq.* See *Quality Oil Co. v. du Pont & Co.*, 182 Kan. 489, 493, 322 P.2d 731 (1958) (citing to KFTA in L. 1937, ch. 165, secs. 1-10). It specifically permitted contracts controlling resale prices, G.S. 1949, 50-302, and explicitly authorized private suits to punish deviation from them. G.S. 1949, 50-306. Such suits could be brought against not only a reseller who was party to the newly legal price-fixing contract, but also against a third-party retailer who had never agreed to the price control. G.S. 1949, 50-306; see *Quality Oil*, 182 Kan. at 493-94 (discussing KFTA provisions).

In 1958, this court struck down the third-party provision as "statutory price[-]fixing by compulsion," in conflict with the Kansas Constitution. *Quality Oil*, 182 Kan. at 495-96. This court stated:

"[W]e conclude the nonsigner clause of the Fair Trade Act is an unconstitutional attempt to delegate legislative power to private persons in violation of Art. 2, § 1 of the Kansas Constitution. The statute, beyond permitting voluntary contracts or agreements between a trade-mark owner and a retailer to fix a minimum resale

price binding upon the signing retailer, gives legislative sanction to the trade-mark owner to fix minimum resale prices binding upon nonsigners.

. . . .

". . . The legislature is powerless to clothe a private person with power to fix minimum resale prices, binding upon all who acquire and sell his trade-mark commodity with whom he has no direct contractual relation. An attempt to confer such power is an attempt to delegate legislature power, which is futile." 182 Kan. at 495-96.

The legislature repealed the KFTA in 1963. This repeal, in theory, returned Kansas to the simple, per se rule developed by *Mills*, *United Artists*, and *Joslin*: Vertical price-fixing arrangements again were *always* impermissible in Kansas. None of the pre-KFTA cases or the statutory provisions they applied had imposed a threshold judicial evaluation of the reasonableness of the subject contract's trade restraint before a violation preventing enforcement could be recognized.

If anything about that simple, per se rule changed between 1937 and 1963, that is, while the KFTA was in effect, it had to have changed because of *Heckard* and *Okerberg*, the only two relevant cases decided during the period.

In 1948's *Heckard*, Bessie B. Heckard and singer Lucile Jeannie Park entered into a vocal training contract. Under the contract, Park agreed to certain restrictive covenants, including: "[n]ot to employ or accept tutelage from any musical instructor without plaintiff's written consent"; "[t]o engage plaintiff's services as defendant's exclusive manager and agent"; and "[t]o pay plaintiff 10% of all, if any, professional earnings equal or exceeding $100.00 per week which defendant might obtain during, but only during, the next seven years following the execution of the written agreement." 164 Kan. at 221. Heckard sued Park for an accounting and for specific performance of the written contract under G.S. 1935, 50-101 and G.S. 1935, 50-112, which were identical in all relevant respects to today's K.S.A. 50-101 and K.S.A. 50-112. There was no allegation that the contract contained any vertical price-fixing provisions.

This court held in favor of Heckard and said that "[t]he real question is never whether there is any restraint of trade but always

whether the restraint is reasonable in view of all the facts and circumstances and whether it is inimical to the public welfare." 164 Kan. at 223-24. Because the court viewed the contract as reasonable under all of the circumstances, it could be enforced despite the covenants. 164 Kan. at 224 (citing *Mills v. Cleveland*, 87 Kan. 549, 125 P. 58 [1912] [contract "limiting the right of a physician to practice a specialty and limiting his right to sell or disclose certain formulas used in such practice" upheld as valid because "reasonable[] under all the circumstances"]; *Kent Oil Co. v. Waddill*, 127 Kan. 704, 274 P. 1113 [1929] [contract limiting former employee "not to engage in that kind of work [for which employee was employed] for himself or any other person within the city for a period of two years after the termination of the employment" upheld as reasonable; order granting temporary restraining order to enforce the contract affirmed]; *Berkey v. Smith*, 138 Kan. 792, 796, 28 P.2d 763 [1934] [contract in which apprentice "promise[d] not to enter into competition with undertaker within radius of ten miles in consideration of undertaker's instructing apprentice in art of embalming and funeral directing" upheld as reasonable; injunction affirmed]; *Southwest Kan. Oil & G. Co. v. Argus P. L. Co.*, 141 Kan. 287, 39 P.2d 906 [1935] [reasoning that "[a] bargain in restraint of trade is illegal, not if there is restraint, but if the restraint be unreasonable" and upholding "[c]ontract whereby producers agreed to sell, at fixed price, and distributor to buy, all gas produced from producers' well up to requirements of distributor"]).

In 1959's *Okerberg*, this court upheld contracts regulating milk routes against an antitrust challenge under G.S. 1949, 50-101 and G.S. 1949, 50-112. 185 Kan. at 219. The contracts set territories, required approval from a committee of the milk producers for route changes, required haulers to serve all producers within their territories who sold to a specific creamery, protected haulers against encroachment on their routes, and provided for sale or transfer of tank hauling rights. 185 Kan. at 218-19. Vertical price-fixing was not in issue.

We quoted *Heckard* with approval, treating reasonableness as a threshold inquiry when an antitrust violation was alleged, and ex-

amined " 'fundamental elements of common fairness in view of the facts and circumstances of the parties.' " 185 Kan. at 217 (quoting *Heckard*, 164 Kan. at 224). As with the vocal training contract in *Heckard*, because this court viewed the *Okerberg* milk route contracts as reasonable, they also were enforceable. The contracts' limiting effect on the parties' market behavior did not make them illegal under the ostensibly governing statutes. 185 Kan. at 219.

Careful examination of *Heckard* and *Okerberg* demonstrates that the "reasonableness" rubric they instituted had and has nothing to do with evaluation of an alleged price-fixing arrangement. This is also true of the cases upon which *Heckard*, and, in turn *Okerberg*, relied. The restraints of trade at issue—for example, covenants not to compete and a requirements contract—are factually and legally distinct from the vertical and horizontal price-fixing alleged in this case under K.S.A. 50-101 and K.S.A. 50-112.

There is another, more basic reason not to apply the reasonableness rubric of *Heckard* and *Okerberg* to this price-fixing case: Under the pattern for interpretation of statutes that this court has now firmly established, we are loathe to read unwritten elements into otherwise clear legislative language. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010) (" 'The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted.' "). We take the legislature at its word, unless there is ambiguity, because the legislature, unlike the judiciary, is one of the branches of government charged with development of public policy on behalf of the electorate and because our deference to clear statutory language leads to long-term predictability and stability in Kansas law. See *Quality Oil*, 182 Kan. at 495 (decision on whether K.S.A. 50-112 reflects sound economic policy not the court's to make). This means that, if the *Heckard* and *Okerberg* contracts were to come before us now, it is all but certain we would not append a requirement that an antitrust plaintiff demonstrate the unreasonableness of a defendant's trade restraint to show a statutory violation, because the clear language of the governing statutes does not require it. See K.S.A. 50-101 ("[*a*]*ny* such combinations are hereby declared to be against public policy, unlawful and void.") (Emphasis added.); K.S.A. 50-112 ("[a]ll arrangements,

contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles . . . are hereby declared to be against public policy, unlawful and void.") (Emphasis added.). If the legislature had wanted to make such a showing part of an antitrust action, it certainly was capable of doing so. In the absence of the policy message such a legislative addition would send, we have no confidence in the soundness of the *Heckard* language—"The real question is never whether there is any restraint of trade, but always whether the restraint is reasonable in view of all the facts and circumstances and whether it is inimical to the public welfare"—at the time it was written and today.

As K.S.A. 50-101 and K.S.A. 50-112 now read, the proper approach is *not* to determine "whether the restraint is reasonable in view of all of the facts and circumstances," or to attempt to distinguish between restraints with anticompetitive effect and restraints that stimulate competition. *Cf. Heckard*, 164 Kan. at 223-24; *Leegin*, 551 U.S. at 886. The clear statutory language of K.S.A. 50-101 and K.S.A. 50-112 leaves no room for such an approach. The simple, per se rule of *Mills*, *United Artists*, and *Joslin* survives. The reasonableness rubric of *Heckard* and *Okerberg* is overruled.

Because we decide that reasonableness does not set the antitrust violation standard in Kansas, we need not reach Brighton's cross-appeal arguments that O'Brien's claims are blocked by the rule of reason.

### Horizontal Price-fixing

O'Brien has also contended that Brighton's ownership of stores that sell Brighton products qualifies it as a competitor to the retailers with which it entered into pricing agreements; this, in turn, would support a claim for horizontal price-fixing. Brighton has one retail store in Kansas and more than 100 such stores nationwide. Brighton has countered that its status as a dual-distributor, *i.e.*, both a wholesale supplier and a retailer of its own products, does not support a horizontal price-fixing claim because dual-distribution systems are treated as vertical arrangements under federal law.

On appeal, Brighton has asserted that O'Brien raised any challenge to the district judge's rejection of any horizontal price-fixing claim too late to preserve it for our review. Our review of the record and briefs in this matter indicates otherwise, and we therefore consider the merits of the challenge.

The district judge concluded in a one-paragraph footnote to his Memorandum Decision on summary judgment that "the claims made do not involve horizontal price-fixing." He reasoned that the Heart Store agreements at issue were between Brighton as the wholesale supplier of Brighton products and its retailers, and that the RPM policy set forth the relationship between Brighton as the wholesale supplier of Brighton products and its retailers. In other words, both had vertical rather than horizontal structure and impact.

We have not previously evaluated a dual distribution price-fixing case. The governing KRTA provisions, K.S.A. 50-101 and K.S.A. 50-112, neither differentiate between vertical and horizontal price-fixing nor outline a particular approach to a dual-distribution situation. Rather, as fully discussed above, they forbid all price-fixing combinations or arrangements, regardless of the applicable label. Were this case in federal court, flawless labeling would have more bite, because horizontal price-fixing is still subject to a per se prohibition while vertical price-fixing—held to include dual-distribution situations by every circuit to examine the question—is analyzed under the rule of reason. See *Leegin*, 551 U.S. at 893 (vertical price-fixing subject to rule of reason analysis); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) (dual-distribution treated like vertical price-fixing); *EEC v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (same); *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir. 1993) (same); *Illinois Corporate Travel v. American Airlines*, 889 F.2d 751, 753 (7th Cir. 1989) (same); *International Logistics Group v. Chrysler Corp.*, 884 F.2d 904, 906 (6th Cir. 1989) (same); *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1230 (8th Cir. 1987) (same); *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15, 16 (4th Cir. 1981) (same); compare *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004-1007 (5th Cir.

1981) (same); *Glacier Optical, Inc. v. Optique du Monde*, 1995 WL 21565 (9th Cir. 1995) (unpublished opinion) (same).

Because this state court case arises under the KRTA rather than federal law, the rule of reason does not apply. To the extent O'Brien's horizontal price-fixing claim rests on conduct identical to that supporting her vertical price-fixing claim, horizontal price-fixing is an alternative theory of liability. Proof of an alternative theory does not entitle a plaintiff to additional damages, but it gives a factfinder another way to get to judgment in the plaintiff's favor. O'Brien, like any civil plaintiff, could pursue an alternative theory of liability if it is supported by evidence. The district judge erred in ruling that the class "claims do not involve horizontal price-fixing." They do. Because the district judge did not, evidently, reach the next question of whether O'Brien has come forward with enough evidence to avoid summary judgment on horizontal price-fixing, we do not reach it either.

*Statute of Limitations on Full Consideration and Treble Damages Claims*

For persons injured or damaged by price-fixing prohibited under K.S.A. 50-101 and K.S.A. 50-112, recovery of damages sustained, full consideration damages, and treble damages are permitted. See K.S.A. 50-108 (applying to K.S.A. 50-101; "such damages sustained"); K.S.A. 50-115 (applying to K.S.A. 50-112; "full consideration or sum paid"); K.S.A. 50-161(b) (applying to all of KRTA; "treble the damages sustained," "any damages suffered"); see also K.S.A. 50-147 ("The rights and remedies given by this act shall be construed as cumulative of all other laws in force in this state, and shall not affect, change or repeal any other remedies or rights now existing in this state for the enforcement, payment or collection of fines, penalties and forfeitures."). The parties disagree on the applicable statute of limitations and the attendant downward pressure it may exert on any eventual full consideration or treble damages award. We now address the merits of this disagreement.

O'Brien argues in favor of application of the 3-year statute of limitations in K.S.A. 60-512(2). It provides that "[a]n action upon a liability created by a statute other than a penalty or forfeiture"

must be brought in 3 years. O'Brien argues that both the full consideration and the treble damages provisions are civil remedies, not penalties, designed to encourage consumers to exercise their rights under the KRTA.

Brighton advocates for application of the 1-year statute of limitations in K.S.A. 60-514(c), which governs "[a]n action upon statutory penalty or forfeiture." Brighton argues that both the full consideration and treble damages provisions are statutory penalties because they award more than actual damages and are cumulative with actual damages.

We also note as an initial matter that *amicus* Quin Jackson, in addition to supporting O'Brien's argument for application of the 3-year statute of limitations, states that the discovery rule of K.S.A. 60-510 applies and that "fraudulent concealment and other tolling issues may be raised as well." Neither of the parties has ever made an issue of either the discovery rule or any tolling doctrine, and we therefore do not address their merit or lack of merit. See *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 561, 186 P.3d 183 (2008) (court will not address arguments raised only by nonparty *amici curiae*).

District Judge Woolley split the baby. He ruled that the full consideration claim under K.S.A. 50-115 was not a claim for a penalty and was, therefore, subject to the 3-year statute of limitations under K.S.A. 60-512(2). He also ruled that the treble damages claim under K.S.A. 50-161 was a claim for a penalty and was, therefore, governed by the 1-year statute of limitations under K.S.A. 60-514(c).

The KRTA explicitly established a cause of action for individuals to sue and recover general "damages" as well as specific types of damages. See K.S.A. 50-102; K.S.A. 50-108; K.S.A. 50-115; K.S.A. 50-161. It thus creates not only a new procedure for relief, but also new substantive rights. See *Wright v. Kansas Water Office*, 255 Kan. 990, 997, 881 P.2d 567 (1994); see also *Four B Corp. v. Daicel Chemical Industries, Ltd.*, 253 F. Supp. 2d 1147, 1155-56 (D. Kan. 2003) (concluding plaintiff's antitrust claims under Kansas law arise out of antitrust statute). In addition, we note that the remedies for persons under the KRTA are separate and distinct from the civil

penalties the attorney general is empowered to seek. See K.S.A. 50-103(a)(5); see also K.S.A. 50-160(a) ("The commission of any act or practice declared to be a violation of the Kansas restraint of trade act shall render the violator liable to the state for the payment of a civil penalty in a sum set by the court of not less than $100 nor more than $5,000 for each day such violation shall have occurred."); K.S.A. 50-160(b) ("Any person who willfully violates the terms of any court order issued pursuant to the Kansas restraint of trade act shall forfeit and pay a civil penalty of not more than $10,000 per violation, in addition to other penalties that may be imposed by the court . . . . [T]he district court issuing an order shall retain jurisdiction, and in such cases, the attorney general may petition for recovery of civil penalties.").

In the words of K.S.A. 60-512(2), an action based on the KRTA is "upon a liability created by statute." See *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 821, 1 P.3d 899 (2000) (quoting *Wright*, 255 Kan. at 997) (liability " 'created by statute' " when " 'liability for resultant damages would not arise but for the statute' "). Likewise, an action based on the KRTA qualifies for the one-word description of K.S.A. 60-514(c): It is "statutory." The rest of the relevant language from the two statutes of limitation requires construction. See *Brennan v. Kansas Insurance Guaranty Ass'n*, 293 Kan. 446, 450, 264 P.3d 102 (2011) (when legislative intent not clear from statutory language court moves to applying canons of construction or legislative history). Although an action seeking a "penalty or forfeiture" is plainly excluded by K.S.A. 60-512(2) and plainly included by K.S.A. 60-514(c), "penalty or forfeiture" is not clearly defined. And we have not previously construed "penalty or forfeiture" as applied to either full consideration damages or treble damages under the KRTA. In the only one of our cases in which the KRTA statute of limitations was in issue, we did not decide the question because the plaintiff's action would have been barred by either limitations provision under consideration. *McCue v. Franklin*, 156 Kan. 1, 131 P.2d 704 (1942).

Judge Carlos Murguia of the federal District of Kansas did reach the issue of the statute of limitations applicable to the KRTA treble damages remedy in *Four B Corp.*, 253 F. Supp. 2d at 1155-56,

deciding the 3-year statute of limitations in K.S.A. 60-512(2) applied. Judge Murguia cited this court's decision in *Alexander*, 268 Kan. at 820, in support of the proposition that "[a] claim which arises from a statute does not automatically constitute a 'penalty' or 'forfeiture' so as to trigger a one-year statute of limitations period, even if a plaintiff is entitled to recover more than his actual damages." *Four B Corp.*, 253 F. Supp. 2d at 1154-55. The question of which statute of limitations should apply to KRTA full consideration damages was not before the court in *Four B Corp.*

In an action brought under the Kansas Consumer Protection Act (KCPA), we stated that "in many instances where a statute gives accumulative damages to the party grieved, it is not a penal action." *Alexander*, 268 Kan. at 824 (citing *Huntington v. Attrill*, 146 U.S. 657, 667-69, 13 S. Ct. 224, 36 L. Ed. 1123 [1892]). We observed that under the KCPA a consumer had the option to seek either damages or a civil penalty, not both. 268 Kan. at 823. But we said that the key question was whether a statutory provision was more remedial or punitive in nature. 268 Kan. at 823.

In *Alexander*, we examined the KCPA statutory scheme and concluded that "the KCPA provides a private remedy to consumers in the hope that they will enforce the KCPA as 'private attorneys general,' " and that consumer suits allowed individuals to gain "reimbursement for the private wrong done." 268 Kan. at 822, 824. We ultimately determined that both an action seeking a civil penalty and one seeking actual damages should be subject to the 3-year statute of limitations because treating the two differently would frustrate the intent of the statute to create an effective remedy for Kansas consumers. 268 Kan. at 823-24. We said that a 1-year statute of limitations would be appropriate "if the legislature had provided for a separate penalty in addition to a damage recovery." 268 Kan. at 824.

As Brighton has noted, both the full consideration damages and treble damages recoverable under the KRTA would exceed actual damages, and it makes sense to subject both provisions to the same statute of limitations analysis. See 268 Kan. at 824 (under KCPA, applying "two different statutes of limitation would force the consumer to file within 1 year, or find his or her options for recovery

reduced to merely actual damages"). But, otherwise, we regard O'Brien's statute of limitations argument as generally more consistent with our reasoning in *Alexander.*

The 3-year statute of limitations in K.S.A. 60-512(2) gives a greater incentive to consumers to exercise their statutory rights by bringing private actions under the KRTA. Like the KCPA, the KRTA enables individuals to gain "reimbursement for the private wrong done." See 268 Kan. at 824. Also like the KCPA, the KRTA's provisions allowing private suits permit consumers to act as " 'private attorneys general' " to enforce the provisions of the statute and prevent further wrongdoing. See 268 Kan. at 822. We also are persuaded that both full consideration damages and treble damages under the KRTA are "more remedial in nature than punitive." See 268 Kan. at 823. They are chiefly, if handsomely, designed to compensate an individual who has been injured by a trade restraint, while the Attorney General is explicitly empowered to seek civil penalties to punish a violation on behalf of the rest of the citizens of the state. K.S.A. 50-103(a)(5); K.S.A. 50-160.

We therefore hold that neither O'Brien's claim for full consideration damages nor her claim for treble damages qualifies as an action for a statutory penalty or forfeiture. They are both subject to the 3-year statute of limitations under K.S.A. 60-512(2). This holding compels us to affirm the district judge's partial summary judgment ruling on the question of full consideration damages and to reverse his summary judgment ruling on the question of treble damages.

*Necessity of Explicit Written Agreement*

Brighton argues on its cross-appeal that it was entitled to partial summary judgment against O'Brien on any purchases made at Kansas retailers that were not Heart Stores in 2001 or 2002 and/or luggage stores in 2003, that is, for any purchases made at all but nine Kansas stores during the specified years. Brighton asserts that the KRTA, like federal law, demands that a plaintiff alleging vertical price-fixing come forward with proof of "agreement and concerted action" between each specific retailer and Brighton. In its view, the evidence O'Brien has gathered cannot possibly demonstrate

that there was the necessary meeting of the minds between Brighton and the overwhelming majority of Kansas retailers subject only to Brighton's pricing policy and not designated a Heart Store nor authorized to sell luggage.

O'Brien responds that the written agreements between Brighton and nine of its Kansas retailers were merely the clearest evidence of a larger, unwritten price-fixing arrangement between Brighton and all of its Kansas retailers. She urges us to consider all of her evidence and the reasonable inferences a jury may be permitted to draw from it in context, arguing there is plenty in the record to enable her to escape summary judgment on the issue of whether Brighton acted unilaterally or in unlawful conjunction with its Kansas retailers.

Judge Goering denied partial summary judgment to Brighton on this issue. He determined that "[t]he KRTA requires concerted action by two or more persons or entities to fix prices," without citation to a specific KRTA provision. The district judge reasoned that O'Brien established the existence of a genuine issue of material fact on the scope of any arrangement or agreement. He noted, in particular, evidence of Brighton's enforcement practices and the dispute between the parties over the purpose of Brighton's RPM policy.

As we observed above, K.S.A. 50-101 and K.S.A. 50-112 prohibit more than "agreements" to fix prices. But even a "combination" under K.S.A. 50-101 must be "by two or more persons" and an "arrangement" under K.S.A. 50-112 must be "between persons." Both requirements demand something more than merely a unilateral pricing policy adopted by a wholesale supplier in the position of Brighton.

Because K.S.A. 50-112 and § 1 of the Sherman Act share the "between persons" language, and the language of K.S.A. 50-101 is equivalent, we look to interpreting United States Supreme Court precedent for assistance in understanding what, short of an express agreement, qualifies as more than merely unilateral behavior. Has O'Brien mustered enough evidence to avoid summary judgment on those purchases made at Brighton retailers who were not parties to Heart Store or luggage store applications or agreements?

In *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763, 768, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984), the Court ruled that, under § 1 of the Sherman Act, a price-fixing case must include "evidence that tends to exclude the possibility of independent action by the manufacturer and distributor." "[T]here must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective," and neither communication between a manufacturer and its retailers nor the existence of complaints about discounting would be enough alone for a plaintiff in a price-fixing action to sustain its burden of proof. 465 U.S. at 768. The Court acknowledged that evidence of complaints about discounting can be probative; however, there must be additional evidence of unlawful conduct. 465 U.S. at 764.

In this case, Brighton emphasizes evidence from several retailers who said that they independently decided to charge the suggested price for Brighton products. It reminds us that Brighton's officers testified that Brighton had not actually terminated any Kansas retailer for a pricing policy violation and that Brighton had not made explicit promises to Heart Stores or luggage stores that it would enforce its pricing policy against other retailers.

But the record contains ample conflicting evidence in support of O'Brien's claim that an unlawful pricing arrangement existed between Brighton and Kansas retailers beyond the nine Heart Stores and/or luggage sellers.

Brighton's pricing policy was distributed to all retailers. And for at least 1 year, Brighton required all of them to initial an acknowledgment stating that violation of the policy was grounds for dismissal. Brighton's owner testified that the company "require[d] everybody to charge the same price." Unauthorized promotions were not allowed because they would "spread like cancer." Brighton maintained a "Pending Pricing Issues" file, and it conducted investigations into at least two Kansas retailers suspected of discounting. One of those investigations was launched when one retailer who was not a Heart Store or luggage seller reported another in the same category.

All of this evidence provides relevant context for the written agreements Brighton entered into with Heart Stores and luggage sellers and at least circumstantially supports a reasonable inference of more than a unilateral policy or action by Brighton.

This evidence also is reminiscent of that before the United States Supreme Court in *Monsanto Co.* In that case, a manager testified that the company advised distributors who were discounting that they were in danger of receiving less than their desired amount of company product. A company representative contacted a distributor's parent company, which then told the subsidiary distributor to comply with the pricing plan. The Court recognized such evidence as "relevant and persuasive as to a meeting of minds." 465 U.S. at 765. In addition, one distributor sent a newsletter to his customers, in which he discussed the company's efforts to " 'get [t]he "marketplace in order" ' " and emphasized the company's efforts to maintain minimum prices. 465 U.S. at 765-66.

The Court ultimately stated in *Monsanto Co.* that it was reasonable to conclude that the termination of a noncomplying distributor was pursuant to a pricing agreement rather than unilateral pricing policy because it was "necessary for competing distributors contemplating compliance with suggested prices to know that those who do not comply will be terminated." 465 U.S. at 767. The Court decided that the plaintiff had marshaled enough evidence to raise a jury issue. 465 U.S. at 768.

We reach a similar conclusion here. There is more than enough evidence in the record before us to hold that the district judge was correct in denying Brighton partial summary judgment on the issue of whether there was an unlawful combination "by two or more persons" under K.S.A. 50-101 or an arrangement "between persons" under K.S.A. 50-112 with an effect on the prices paid for purchases at retailers other than Heart Stores and luggage sellers. This is not a case in which the plaintiff can show only a unilateral pricing policy or action. A genuine issue of material fact remains for trial, and weighing of evidence by this court or by the district judge reviewing a summary judgment motion would be improper. See *Underhill v. Thompson*, 37 Kan. App. 2d 870, 878, 158 P.3d 987, *rev. denied* 285 Kan. 1177 (2007).

*Certification of the Plaintiff Class*

The last issue raised in Brighton's cross-appeal concerns class certification. We address its status to provide guidance to the district court on remand.

Class actions are governed by K.S.A. 60-223, which was modeled after and has traditionally been interpreted like Fed. R. Civ. Proc. 23. *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 778, 89 P.3d 908 (2004) (*Dragon I*). The class in this case is composed of named plaintiff O'Brien and "[a]ll persons who . . . from January 1, 1997, . . . to the date of trial, have purchased any Brighton product from any Brighton retailer."

At the time this case was filed, K.S.A. 60-223(b)(3), the subsection of the statute that is relevant here, stated that a class should be certified if

"the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) The interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

District Judge Richard T. Ballinger ordered certification of the class, Brighton filed an interlocutory appeal challenging that certification. The appeal was denied by the Court of Appeals without explanation. Brighton also moved to decertify the class in the district court, but, given Judge Goering's summary judgment ruling in favor of Brighton on antitrust injury, the judge never ruled on the motion to decertify.

On its cross-appeal, Brighton challenges only Judge Ballinger's analysis of K.S.A. 60-223(b)(3), the predominance requirement. It seeks a ruling from us that the district judge abused his discretion in certifying the class.

Brighton makes two arguments: (1) O'Brien and the class lack a method of common proof for showing injury, *i.e.*, payment of a

price higher than the price that would have been paid absent an unlawful restraint; and (2) O'Brien and the class lack a common method of proof for showing each Kansas retailer entered into an illegal arrangement with Brighton.

In response to Brighton's first point, O'Brien asserts that there is common proof that every purchase was made at a fixed price in a distorted market. In response to Brighton's second point, O'Brien asserts that there is common proof of Brighton's written agreements, its pricing policy, and its monitoring and enforcement activities—all of which, taken together, establish the extent of the arrangement.

Under *Dragon I*, we do not judge " 'the propriety of a class certification by hindsight' " but rather to ensure that the district judge applied and " 'rigorous[ly] analy[zed]' " the requirements of K.S.A. 60-223 in its decision to certify the class. 277 Kan. at 780; see also *Critchfield Physical Therapy v. Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011). If a district judge evaluates the proper factors, his or her decision will be granted deference on appeal. See 277 Kan. at 779.

Here, the district judge incorporated the transcript of the oral argument on the motion for class certification into his decision in this case. During the oral argument, the judge stated that he had reviewed all of the documents filed by the parties, and he concluded that "the requirements of 223(a)(1) through 4 are clearly met" because "[t]here's no factual issue. The legal issues are really common, whether or not there is one person or there are a thousand people who have bought belts from [Brighton]." Specifically regarding the factors to be considered on predominance, the judge said:

"The interest of the members, the extent and nature of the litigation controversy, the desirable concentration in the litigation, certainly the judicial economy comes into play in there, too, but of course that's not determinative, and the difficulties likely to be encountered in the management of the class action, those are all considerations and clearly tend to show that a class action is appropriate in this case."

In his journal entry, the judge repeated that he had

"considered and carefully examined the evidence in relation to:

"(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

"(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

"(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and]

"(D) the difficulties likely to be encountered in the management of the class action."

But, as at oral argument, the judge did not make factual findings or explain how he had considered or applied the statutory factors to arrive at his legal conclusions. He said merely that he had reached its ultimate conclusions regarding predominance "in light of the evidence."

After the district judge's certification ruling, we handed down our decision in *Dragon v. Vanguard Industries*, 282 Kan. 349, 144 P.3d 1279 (2006) (*Dragon II.*). In that case, we determined that K.S.A. 60-252(a) and Supreme Court Rule 165 (2011 Kan. Ct. R. Annot. 246)—which require that a district court judge "find, and either orally or in writing state, the controlling facts and the judge's conclusions of law thereon" and "state the controlling facts required by K.S.A. 60-252, and the legal principles controlling the decision"—apply to a district judge's class certification decision. 282 Kan. at 356. Generally litigants and their counsel bear the responsibility of objecting to inadequate findings of fact and conclusions of law

"to give the trial court the opportunity to correct them, and in the absence of an objection, omissions in findings will not be considered on appeal. [Citation omitted.] Where no objection is made, this court will presume the trial court found all facts necessary to support its judgment. However, this court may still consider a remand if the lack of specific findings precludes meaningful review. [Citation omitted.]" *Dragon II*, 282 Kan. at 356.

In this case, it does not appear that Brighton objected specifically to inadequate findings and conclusions on certification, but it did attempt to pursue a timely interlocutory appeal. When the Court of Appeals rebuffed that effort, Brighton filed a motion to decertify

the class. And it included the predominance issue in its prophylactic cross-appeal.

Because Brighton made a consistent effort to keep its challenge to certification alive, both in the district court and before this court, and because the district judge's insufficient factual findings and legal conclusions preclude meaningful appellate review of class certification at this procedural juncture, we merely observe that Brighton's motion to decertify the class remains pending. It will, on remand, be ripe for decision. When that motion is heard and decided, the parties and the district judge will have the opportunity to ensure creation of a record adequate to support any future appropriate appellate review.

## CONCLUSION

After a thorough review of the record and the parties' extensive arguments on this appeal and cross-appeal, we hold that the district judge erred in his demand for proof of a "concrete injury" in this price-fixing case under K.S.A. 50-101 and K.S.A. 50-112. This holding requires reversal of the district judge's summary judgment in favor of defendant Brighton, and this case must be remanded to district court.

Brighton also was not entitled to summary judgment under a "rule of reason," which is not applied in a price-fixing action brought under K.S.A. 50-101 and K.S.A. 50-112 of the KRTA.

The district judge erred in ruling that the claims of the plaintiff class do not involve horizontal price-fixing. The named plaintiff and class have made an alternative allegation of unlawful horizontal restraint.

We affirm in part and reverse in part on the district judge's statute of limitations rulings. The limitations provision applicable to the class claims for both full consideration damages and treble damages is the 3-year statute of K.S.A. 60-512(2).

We hold that the district judge correctly determined that a genuine issue of material fact remained for trial on the issue of whether there was an unlawful combination or arrangement under K.S.A. 50-101 and K.S.A. 50-112 between Brighton and its retailers who had no express agreements as Heart Stores or luggage sellers.

And, finally, the insufficiency of the district judge's findings of fact and conclusions of law on class certification preclude meaningful appellate review of the predominance issue raised in Brighton's cross-appeal. On remand, Brighton's motion to decertify the class will be ripe for decision under the guidance of this court's opinions in *Dragon I*, 277 Kan. at 778-93, and *Dragon II*, 282 Kan. at 360-64.

Reversed and remanded to the district court for further proceedings consistent with this opinion.

MALONE, J., assigned.