IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,409

STATE OF KANSAS,
*Appellee*,

v.

JASON A. JONES,
*Appellant.*

SYLLABUS BY THE COURT

1.

The Confrontation Clause applies to testimonial statements and prohibits the admission of such statements by a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.

2.

A certificate of analysis showing the results of a forensic examination that has been performed on substances seized by police is testimonial. Because the certificate is testimonial, the prosecution cannot introduce the certificate without presenting it through the in-court testimony of a witness who can swear to the truth of the statements contained in the certificate.

3.

The Confrontation Clause does not permit the prosecution to introduce a forensic laboratory report containing a testimonial certification, created to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification.

1

**4.**

Harmless error review applies to issues pertaining to the Confrontation Clause of the Sixth Amendment. An appellate court employs a de novo review of the entire record when determining whether a fundamental failure in a trial is harmless.

**5.**

A harmless error is one that did not affect a party's substantial rights, meaning it will not or did not affect a trial's outcome. When an error infringes upon a party's federal constitutional right, a court will declare the error harmless only where the party benefiting from the error persuades the court beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict.

**6.**

An appellate court reviews a trial court's determination regarding whether hearsay is admissible under a statutory exception for an abuse of discretion.

**7.**

Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.

8.

When hearsay is admitted under the coconspirator exception, it must satisfy three standards: (1) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (2) the statement of the coconspirator must have been made while the conspiracy was in progress; and (3) the statement must be relevant to the plan or its subject matter.

9.

Generally, litigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies, and, when there is no objection, omissions in findings are not considered on appeal.

10.

When there is no objection to a trial court's findings, an appellate court presumes that the trial court found all facts necessary to support its judgment.

11.

Statements by coconspirators are not testimonial and do not implicate the Confrontation Clause.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed August 4, 2017. Affirmed.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

3

The opinion of the court was delivered by

MALONE, J.: Jason A. Jones appeals his convictions of first-degree premeditated murder, first-degree felony murder, and aggravated kidnapping. This is a companion case to *State v. Sean*, No. 114,417, an appeal from convictions arising out of the same series of events presented in this case. Jones argues (1) his right to confront witnesses under the Sixth Amendment to the United States Constitution was violated when forensic testing results came into evidence without Jones having the opportunity to cross-examine the laboratory analyst who performed the tests; and (2) certain hearsay statements were erroneously admitted by the trial court. Because we conclude that any error on the part of the trial court was harmless, we affirm.

FACTS AND PROCEDURAL BACKGROUND

In January of 2013, Jason A. Jones worked at an automotive shop owned by Dang Sean. Shawn Lindsey had been Sean's business partner in the shop until sometime in 2012, and he owed Sean money. On Friday, January 11, 2013, Sean directed Anthony Garza to pick up Lindsey and bring him to the shop, apparently to discuss the debt. Sean had met Garza a year earlier when Garza sold him a computer. Since that meeting, Garza had spent time at Sean's auto shop because Garza's girlfriend worked there. Garza, accompanied by his nephew Reuben Carrion, Jr., and his friend Aaron Stricker, drove to Lindsey's home.

Lindsey's girlfriend, Chelsea Bernhard, was home with Lindsey when the three men arrived. Bernhard testified that Lindsey talked with Garza and then Lindsey told her that he had to go to Sean's auto shop.

4

Sean, Jones, and three other shop employees—Will Coleman, Justin Jones (Justin) and Phomphikak Phouthalaksa (Air)—were at the shop when Garza and Lindsey arrived around 7 p.m. Sean and Lindsey began discussing the debt. Shortly after their conversation began, Sean began punching and kicking Lindsey and knocked him to the floor.

After the beating, Sean told Jones to take Lindsey, along with Garza and Stricker, to look for Lindsey's truck. While not entirely clear from the record, Sean may have wanted the truck as some type of collateral for the debt. The men left the shop, and Sean left shortly thereafter.

Garza testified that while the men were driving in Jones' car looking for the truck, he spoke to Justin on the phone, who told him to zip-tie Lindsey and not let him go when they returned to the shop. Coleman testified that when the men returned to the shop, Jones was on his telephone and informed the person on the other end of the call that the men still did not have the truck. Coleman then heard Jones tell the others to make sure Lindsey did not leave.

Sean, carrying a duffel bag, arrived back at the shop shortly after the men had returned from looking for Lindsey's truck. According to Coleman, Sean was also carrying a gun and a syringe. Sean ordered someone to zip-tie Lindsey's hands together. Coleman stated that someone then zip-tied Lindsey's hands.

Garza noticed that Justin was holding a bag of methamphetamine and Jones was holding a spoon. He estimated that the bag contained a quarter ounce of methamphetamine—35 times the amount of a typical single dose. Garza heard Justin and Jones discuss needing to find a torch to melt the methamphetamine. Garza observed

5

Jones pour the methamphetamine into the spoon while Sean was holding a syringe and needle.

According to Garza, Justin held Lindsey's right arm while Sean injected Lindsey. Lindsey pleaded for them to stop and promised to pay Sean back. After the injection, Air approached with an electric fence, and Justin and Jones wrapped the fence around Lindsey. Jones gave a car battery starter to Air, who connected the battery to the fence but did not turn it on.

Sean approached Lindsey with a firearm and an air soft gun. Sean began shooting Lindsey with pellets from the air soft gun, and Garza testified that Lindsey began shaking violently. Sean pointed the firearm at Lindsey and then shot pellets from the air gun at the battery charger in a failed attempt to turn it on. Garza eventually removed the fence.

After he removed the fence, Garza heard someone say that Lindsey was "almost gone" and "about to go." Sean told Garza to cut the zip ties at Lindsey's feet so Lindsey could walk to the truck because they were going to take him to the hospital. Jones and Sean led Lindsey to a black Silverado truck and loaded him in. After loading Lindsey, Sean told Garza to "get the fuck out of here" so Garza and Stricker walked out of the shop and left.

At 10:47 p.m., a security camera in the parking lot of the Humane Society recorded a vehicle on an access road close to the area where Lindsey's body was later discovered. The State posited that this was the black Silverado truck dumping Lindsey's body.

Garza received a text from Jones later that night, instructing Garza not to say anything to his girlfriend. Hours later, Jones and Justin picked Garza up and took him

6

back to the shop. When they got to the shop, Sean told Garza that if Garza or Stricker said anything he would kill them.

On January 13, 2013, Bernhard notified police that she had not seen Lindsey for 2 days. On January 16, Lindsey's body was discovered lying face down in a field close to the Humane Society. The body had ligature marks on the left wrist. An initial autopsy did not reveal a cause of death but revealed injuries to the wrist consistent with zip ties. A subsequent toxicology report revealed high levels of methamphetamine in Lindsey's blood. Based on these results, the coroner determined that the cause of death was methamphetamine toxicity and that the manner of death was homicide.

A jury convicted Jones of first-degree premeditated murder, felony murder, and aggravated kidnapping. The court sentenced Jones to life with no opportunity for parole for 25 years on the first-degree premeditated murder count and 165 months in prison on the kidnapping count, with the sentences to run consecutive to each other. Jones timely appeals to this court.

ANALYSIS

Jones presents two issues in this appeal. Each is addressed in turn.

*Admission of Forensic Test Results*

After Lindsey's body was recovered, a laboratory technician physically performed tests on Lindsey's blood and recorded the raw data. Dr. Timothy Rohrig, the chief toxicologist at the laboratory, later interpreted this raw data to determine that there were high levels of methamphetamine present in the blood. From these results, Dr. Timothy Gorrill, the coroner, determined that methamphetamine toxicity was the cause of Lindsey's death.

7

During the trial, Dr. Gorrill testified regarding the toxicology results and what they meant according to common reference texts. Jones objected on foundation grounds with regard to the test results, arguing that those results should come in through Dr. Rohrig. Jones also objected on "*Crawford* issues with regard to the reference to the text." The trial judge overruled these objections. Dr. Gorrill opined that the cause of death was methamphetamine toxicity. Jones offered no objection to that assessment.

Dr. Rohrig testified after Dr. Gorrill and reported the results of the laboratory tests during his testimony. Jones objected on grounds of hearsay and "*Crawford*" because Dr. Rohrig had not performed the tests himself. The trial court overruled the objection, stating that Dr. Rohrig had established that he was the director of the facility, that he had written the testing protocol, and that the employees followed that protocol.

Jones' first issue on appeal is that the State's introduction of the forensic test results revealing high levels of methamphetamine in Lindsey's body violated his Sixth Amendment right to confront a witness. Sean contends that he was denied his right because the laboratory analyst who performed the tests did not testify.

An appellate court employs an unlimited standard of review when addressing whether a defendant's right to confront witnesses under the Sixth Amendment has been violated. *State v. Johnson*, 297 Kan. 210, 224, 301 P.3d 287 (2013).

The Confrontation Clause applies to testimonial statements and prohibits the admission of such statements by a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *State v. Williams*, 306 Kan. __, __, 392 P.3d 1267 (2017).

8

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), the United States Supreme Court held that a certificate of analysis showing the results of a forensic examination that had been performed on substances seized by police was testimonial. Because the certificate was testimonial, the Court held that the prosecution could not introduce the certificate without presenting it through the in-court testimony of a witness who could swear to the truth of the statements contained in the certificate. *Melendez-Diaz*, 557 U.S. at 311.

In *Bullcoming v. New Mexico*, 564 U.S. 647, 651, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), the Court further defined a testimonial statement when it held that the Confrontation Clause does not permit the prosecution to introduce a forensic laboratory report containing a testimonial certification—created to prove a fact at a criminal trial— through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification.

Jones relies on this caselaw and more in support of his argument. However, even if we assume that the admission of the test results violated Jones' Confrontation Clause rights, we conclude that any such error was harmless.

Harmless error review applies to issues pertaining to the Confrontation Clause of the Sixth Amendment. This court employs a de novo review of the entire record when determining whether a fundamental failure in a trial is harmless. *State v. Belone*, 295 Kan. 499, 502-03, 285 P.3d 378 (2012).

A harmless error is one that "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). When an error infringes upon a party's federal constitutional right, a court will declare the error harmless only where the party benefiting from the error persuades

9

the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." 292 Kan. at 569.

The United States Supreme Court has explained the application of this rule in the context of a Confrontation Clause issue:

"The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

After reviewing the entire record, we are convinced that the State demonstrated beyond a reasonable doubt that any error in allowing the results of the forensic testing to be admitted as evidence did not affect the outcome of the trial. Jones argues that these results were highly persuasive because the results "bore directly on the cause of [Lindsey's] death" and that the State "relied on those results to establish the element of premeditation."

Jones' argument is unconvincing for two reasons. First, any persuasive evidence that the test results provided was cumulative of evidence that was otherwise admitted without objection. While the exclusion of Dr. Rohrig's testimony would have prevented the jury from hearing the numeric levels of methamphetamine in Jones' blood, the jury

10

still would have heard Dr. Gorrill testify that the cause of death was methamphetamine toxicity. We note that defense counsel did not contest this point, stating repeatedly in closing argument that Lindsey died of "a massive methamphetamine overdose." Thus, while the results of the tests would have provided the numeric levels of methamphetamine in Lindsey's blood, any conclusions regarding Lindsey's cause of death that could be drawn from these results were cumulative of the conclusions drawn by Dr. Gorrill and uncontested by defense counsel.

Second, there was abundant evidence that supported the State's premeditation theory in addition to the tests results. In *State v. Gholston*, 272 Kan. 601, 607, 35 P.3d 868 (2001), we explained that medical evidence showing a murder victim's cause of death is not always integral in establishing a defendant's guilt. In *Gholston*, the State failed to present any evidence that proved the homicide victim actually died from a gunshot wound. However, we concluded that this did not result in insufficient evidence to show that the defendant was guilty of premeditated first-degree murder because there was ample evidence showing that the defendant shot the victim in the head and because the defendant did not challenge the fact that the victim's death was caused by the gunshot wound. 272 Kan. at 608.

Here, physical evidence and witness testimony strongly supported a theory of premeditation. As we noted in *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014), "[p]remeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation."

In this case, Garza and Coleman testified that Jones was present during many of the events on the night of January 11 and actively participated in much of the criminal activity against Lindsey. After Lindsey was beaten by Sean, Jones—along with Garza

11

and Stricker—took him to look for the truck. Unable to find Lindsey's truck, Jones returned Lindsey to the shop and instructed the others not to let him leave. When Sean returned, he ordered Lindsey to be zip-tied. Garza testified that after Lindsey was restrained, Jones was involved in heating a quarter of an ounce of methamphetamine—more than 35 times the amount of a single dose—and loading it into a syringe that Sean injected into Lindsey's arm while Lindsey pleaded for them to stop. After the forced injection, Jones helped wrap Lindsey with an electric fence, and gave a car battery charger to Air, who connected it to the fence. Garza testified that, after Sean injected Lindsey with the methamphetamine, he witnessed Lindsey shaking and heard someone say that Lindsey was "almost gone" and "about to go." Eventually, the zip ties were cut from Lindsey's feet and Jones led Lindsey, who could not walk on his own, from the chair to Sean's truck where Jones helped load Lindsey. Later than night, Garza received a text message from Jones instructing Garza not to say anything to his girlfriend. Hours later, Jones and Justin picked Garza up and took him back to the shop. When they arrived, Sean told Garza that if he or Stricker said anything they would be killed. When Lindsey's body was recovered, physical evidence corroborated the testimony that Lindsey had been zip-tied before his death. Even without the results of the blood test, the jury could have easily concluded that Jones was an intentional participant in Lindsey's murder.

Because we conclude that the State has shown beyond a reasonable doubt that the inclusion of the test results did not affect the outcome of the trial, any error in doing so was harmless. Consequently, Jones' argument fails.

*Admission of Out-of-Court Statements*

Next, Jones contends that testimony regarding two out-of-court statements made by third parties was impermissible hearsay and was erroneously admitted over his

12

objections. He presents two arguments to support this contention:  (1) the trial court erred when it admitted the testimony under the coconspirator exception without making required findings on the record; and (2) the admission of this testimony violated his Sixth Amendment right to confront a witness.

1.      *Coconspirator Exception*

Jones argues that the trial court erred when it admitted certain testimony under the coconspirator exception, K.S.A. 2016 Supp. 60-460(i)(2), because it failed to find on the record the elements essential to the admission of hearsay evidence under this exception.

We review a trial court's determination regarding whether hearsay is admissible under a statutory exception for an abuse of discretion. *State v. Betancourt*, 301 Kan. 282, 297, 342 P.3d 916 (2015). Judicial action constitutes an abuse of discretion if it

> "'(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citations omitted.]'" *State v. Shank*, 304 Kan. 89, 92, 369 P.3d 322 (2016) (quoting *State v. Wilson*, 301 Kan. 403, 405, 343 P.3d 102 [2015]).

A hearsay statement is admissible under the coconspirator exception when "the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination." K.S.A. 2016 Supp. 60-460(i)(2). In *State v. Davey*, 306 Kan. __, __, 2017 WL 3091831, at *5 (2017), we noted that this statute requires that hearsay admitted under this exception

satisfy three criteria: (1) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (2) the statement of the coconspirator must have been made while the conspiracy was in progress; and (3) the statement must be relevant to the plan or its subject matter.

Here, in pretrial motions, the State sought introduction of out-of-court statements by coconspirators, consisting of directives that a different defendant gave concerning the victim and a recorded telephone call that a defendant made from prison expressing concern that someone was informing about what had transpired. The court conducted a hearing addressing the motions and eventually ruled that it would allow the statements if the State were able to demonstrate coconspirator status.

Two statements were introduced at trial based on that ruling. The two out-of-court statements in question are subject to slightly different analyses and, therefore, are discussed separately.

### A. *Garza's Report of Justin's Directive to Restrain Lindsey*

Anthony Garza, who pled guilty to the related kidnapping of Lindsey, testified on behalf of the State. On direct examination, the prosecutor asked what codefendant Justin told him in a telephone conversation prior to Lindsey's death. Jones objected based on hearsay and Confrontation Clause grounds, referring back to his previous objections. When the court denied the objection, the following dialogue took place:

"Q: . . . Without regard to Justin telling you about CD's [Sean's] whereabouts, did Justin give you any instructions?

"A: That when we got back to the shop to not let Shawn Lindsey go, to zip tie him?"

14

Jones bases the most substantial aspect of his argument on the trial court's alleged failure to find that the coconspirator factors existed before it admitted the testimony under the coconspirator's exceptions. After hearing the parties' arguments, the trial court simply stated,

> "Okay. What I'm going to do is take this motion under advisement regarding whether a conspiracy exists. Otherwise, I'm going to grant it, I mean, I'll let you know that that's kind of the final thing. But on paragraph one, the statements made by co-defendants are all exceptions under, you know, 60-460(i)(2)(H), statements of coconspirator."

At the outset, we recognize there is an acute preservation problem in this case. Generally, litigants and their counsel bear the responsibility for objecting to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct such inadequacies, and, when there is no objection, omissions in findings are not considered on appeal. *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012).

Although the trial court did not expressly make the coconspirator findings, Jones never called this to the court's attention, either at the pretrial motions hearing or during the course of the testimony. Accordingly, Jones has not preserved any argument regarding the trial court's findings or lack thereof.

We note that even if we did address this issue, Jones' claim would still fail. When there is no objection to a trial court's findings, this court presumes that the trial court found all facts necessary to support its judgment. *O'Brien*, 294 Kan. at 361; see also *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015); Supreme Court Rule 165(b) (2017 Kan. S. Ct. R. 214).

15

Finally, even if this issue was adequately preserved and the coconspirator findings were in question, it is not clear that the statement constitutes hearsay. Hearsay is evidence of a statement made by someone other than a testifying witness that is offered to prove the truth of the matter stated. K.S.A. 2016 Supp. 60-460.

The out-of-court statement consisted of an instruction by Justin telling Garza to "zip tie" the victim. The statement indicated that the various defendants were operating in pursuit of a common scheme. The statement was not used to prove that Garza in fact bound the victim.

Directives are not susceptible to a determination of truthfulness by a jury. Unlike statements of fact, which are in the indicative mood, directives are in the imperative mood. Such statements, when offered to prove the effect on the listener, are admissible through the person who heard them. *State v. Becker*, 290 Kan. 842, 848, 235 P.3d 424 (2010), citing, *inter alia*, *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) (statements offered as evidence of commands or threats directed to the witness, rather than for the truth of the matter asserted, are not hearsay).

In sum, Jones' argument that the out-of-court statement should not have been admitted due to the trial court's failure to make the required findings on the record fails on several grounds. First, Jones did not preserve this objection at trial. Second, even if we were to reach the question, in the absence of any objection, we assume that a district court made the required findings before admitting hearsay evidence. Finally, it does not appear that this testimony was actually hearsay, and, even if it was, the testimony clearly fell within the coconspirator's exception to the hearsay rule. Thus, Jones suffered no prejudice.

16

B.    *Detective Harty's Summary of Dang Sean's Recorded Telephone Call*

During its examination of Detective Dan Harty, the State played for the jury a recorded telephone call that Sean made from the jail to his wife, Ana. Ana apparently informed Sean that the police had executed a search warrant at the auto shop and seized the electric fence. After the recording was played and as the prosecutor began to ask Harty about its significance, Jones asked the court to "just note for the record" his objection that he made in previous motions. The court overruled the objection, and Harty then read from a prepared transcript of the recording a portion in which Sean said, "Man, someone is rattin' like a mother fucker. The electric fence, for what."

As with the prior out-of-court statement, Jones argues that the trial court erred in failing to make required findings necessary for the admission of hearsay under the coconspirator exception. Here, Jones makes the additional point that one of the required findings—that the statement of the coconspirator must have been made while the conspiracy was in progress—was not met because Sean made the statement after he was arrested and long after the conspiracy was concluded. The State argues that Jones failed to preserve the issue for appeal.

Jones waited to state his objection until after the jury heard the audio recording, even though the contents of that recording had been made known to him in the State's amended motion to admit the recording well in advance of the trial. Jones' failure to object until after the recording was played defeats a purpose of the contemporaneous objection rule, to prevent the jury from hearing impermissible evidence. See *State v. Dukes*, 290 Kan. 485, 489-90, 231 P.3d 558 (2010); *cf. State v. Gordon*, 219 Kan. 643, 652, 549 P.2d 886 (1976) (timely objection rule relaxed when trial to court; no jury to

17

sway by improperly admitted evidence). For this reason, the objection was untimely and not preserved for appeal.

Furthermore, it is doubtful whether it was even necessary for the trial court to make the coconspirator findings because it does not appear that the quoted statement was introduced for the purpose of proving the matter stated. The State was not attempting to prove that someone had "ratted" on the conspirators. Instead, the purpose of introducing the statement was to imply that Sean knew that an illegal act had taken place and that he had a stake in keeping the details secret. At trial, Garza, one of the "rats" who spoke with police, testified on behalf of the State. It was unnecessary to use the recording to prove that he was cooperating with the investigation; Garza freely admitted to the truth of that matter on the witness stand.

Because Jones failed to object to any deficiencies in the trial court's findings and because it is unlikely that the admitted testimony was hearsay, this issue does not provide grounds for reversal.

2.      *Confrontation Clause Issue*

Jones also argues that the admission of the two statements in question violated the Confrontation Clause.

Whether an evidentiary ruling violated a defendant's constitutional rights is reviewed de novo on appeal. See *State v. Robinson*, 293 Kan. 1002, 1023, 270 P.3d 1183 (2012).

As discussed earlier, the United States Supreme Court has held that a witness' testimonial statements against a defendant are inadmissible unless the witness appears at

18

trial or, if the witness is unavailable to testify at trial, the defendant had a prior opportunity for cross-examination. If the statements are nontestimonial, however, the Confrontation Clause guarantees are not implicated. Testimonial statements include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial . . . and to police interrogations." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

But statements by coconspirators are not testimonial and do not implicate the Confrontation Clause. *Crawford*, 541 U.S. at 55-56; *State v. Jackson*, 280 Kan. 16, 35, 118 P.3d 1238 (2005).

In the present case, the out-of-court statements at issue are not testimonial because they were made by coconspirators. Accordingly, there is no reversible issue with respect to the right to confront witnesses.

Judgment of the district court is affirmed.

ROSEN, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1] **REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 113,409 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-2616.