NOT DESIGNATED FOR PUBLICATION

Nos. 122,449
122,450

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Conservatorship and Guardianship of
COLBY SPENCER.

MEMORANDUM OPINION

Appeal from Grant District Court; BRADLEY E. AMBROSIER, judge. Opinion filed February 19, 2021. Affirmed.

*Lane L. Frymire*, of Yoxall, Antrim & Frymire, LLP, of Liberal, for appellant Colby Spencer.

*Michael R. Andrusak*, of Adams Jones Law Firm, P.A., of Wichita, for appellees Garry and Merlene Spencer.

Before WARNER, P.J., POWELL, J., and MCANANY, S.J.

PER CURIAM: This appeal by Colby Spencer challenges the appointment of his parents, Merlene and Garry Spencer, as his co-guardians and co-conservators following a brain injury Colby suffered in an all-terrain vehicle (ATV) accident. He contends that there were significant procedural errors in the guardianship proceedings that denied him of his right to due process and voided the proceedings. He also contends that there was not clear and convincing evidence to support the establishment of either a guardianship or a conservatorship for him.

We conclude that while there were significant procedural irregularities in the guardianship proceedings (and in the conservatorship proceedings as well), Colby neither claims nor establishes that he was prejudiced by any irregularities so as to violate his due process rights. We also conclude that there was sufficient evidence to support the court's

1

findings that Colby was an impaired adult in need of both a guardianship and a conservatorship.

We will take up the facts and arguments regarding each of these legal proceedings separately. The conservatorship proceedings, 2012 PR 13, were initiated in May 2012. The separate guardianship proceedings, 2016 PR 10, were not initiated until June 2016. These proceedings were initially handled by the district magistrate judge. Following Colby's initial appeal, these matters were reviewed de novo on the record by the district court judge. This appeal followed the district court judge's ruling, which affirmed the district magistrate's decision that Colby was in need of both a guardian and a conservator.

*The Conservatorship*

In July 2011, when he was approximately 24 years of age, Colby was involved in an accident while riding an ATV, resulting in a subdural hematoma which required decompression and a partial lobectomy.

On May 10, 2012, Colby's parents, Merlene and Garry Spencer, petitioned the court to appoint them to be co-conservators of Colby's estate. They attached to their petition the report of Dr. Ryan Ernst regarding an April 6, 2012 evaluation in which he reported that Colby was significantly impaired. Colby had short- and long-term memory problems, and his decision-making was impaired. He was mildly depressed and had difficulty making rational decisions.

On May 14, 2012, the court set a hearing on the petition for June 5, 2012. The district magistrate judge appointed attorney Jessica Akers to represent Colby at all stages of the conservatorship proceeding and directed that Colby "shall appear at the trial, at the discretion of the Guardian ad Litem." The judge did not issue all the mandatory preliminary orders required by K.S.A. 59-3063.

2

On May 22, 2012, Akers mailed notice of the June 5 hearing to Colby. There was no personal service as required by K.S.A. 59-3066(c)(1).

Nevertheless, on June 5, 2012, Colby appeared with Akers at the hearing. We have no record of what transpired at that hearing. In any event, the district magistrate judge appointed Colby's parents as his co-conservators.

On July 16, 2012, Colby's father filed his oath as co-conservator. Colby's mother did not. The court issued letters of co-conservatorship to both parents. Between 2012 and 2019, Colby's parents filed no annual accountings for the conservatorship.

In the spring of 2016, Colby began living rent-free in a house located on his parents' farm.

On January 17, 2017, Akers sought leave to withdraw as Colby's counsel due to the breakdown in communications between her and Colby, which resulted in her office having to call the police on two occasions. The court granted the motion on January 24, 2017. No substitute counsel was appointed for Colby.

On April 5, 2019, Colby filed an almost incomprehensible handwritten document, which the district magistrate judge construed as a pro se petition to terminate the conservatorship. (On November 8, 2018, Colby had filed a similar handwritten document, which the court construed as a request that his guardianship be terminated.)

On May 10, 2019, Colby's parents finally submitted annual accountings for the years 2012 through 2018. The court approved the overdue accountings.

On May 16, 2019, the court appointed attorney Cody Smith as Colby's guardian ad litem to represent him at the hearing on Colby's petitions to terminate the guardianship and the conservatorship.

On May 29, 2019, well after the 30-day hearing time limit in K.S.A. 59-3091(c)(1), the court held an evidentiary hearing on Colby's pro se petitions. Following the hearing, the court issued its decision on June 3, 2019. At the outset, the district magistrate judge noted that the hearing was on Colby's motion to terminate the guardianship and conservatorship. After recounting the evidence, the court found clear and convincing evidence that Colby was in need of a conservator and appointed Colby's parents to be Colby's co-conservators, though they already had been appointed co-conservators almost eight years earlier.

On June 13, 2019, Colby appealed to the district court judge for a de novo review on the record of the district magistrate's ruling. It appears that the district court judge's review was confined to the transcript of the trial proceedings and the exhibits introduced at trial. The court affirmed the rulings of the district magistrate and found clear and convincing evidence that Colby is an adult with an impairment who is in need of a conservator because of his inability to manage his personal finances and estate. Again, the court appointed Colby's parents as his co-conservators.

Colby's appeal brings the matter to us.

*Analysis: Sufficiency of the Evidence*

On appeal, Colby ignores the procedural irregularities that led to the appointment of his parents as co-conservators. Rather, his sole contention is that clear and convincing evidence does not support the finding that he needs a conservator.

4

In considering this issue, we do not reweigh the evidence or pass on the credibility of the witnesses. We will not disturb the district court's ruling on appeal if the evidence, viewed in the light favoring Colby's parents—the prevailing parties—supports the district court's ruling. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

The standard of proof needed to support the appointment of a conservator in the first instance is the same standard of proof needed to overcome a motion to terminate a conservatorship—clear and convincing evidence. See K.S.A. 2020 Supp. 59-3067(e)(1); K.S.A. 59-3091(h). Clear and convincing evidence is evidence sufficient to establish that the truth of the facts asserted is highly probable. *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427 P.3d 951 (2018).

K.S.A. 2020 Supp. 59-3067(e)(1) authorizes the appointment of a conservator for an adult with an impairment who is in need of a conservator. The proposed adult conservatee is one "whose ability to receive and evaluate relevant information, or to effectively communicate decisions, or both, even with the use of assistive technologies or other supports, is impaired such that the person lacks the capacity to manage such person's estate . . . and who is in need of a . . . conservator." K.S.A. 2020 Supp. 59-3051(a). The phrase "in need of a conservator" is further defined as "a person who because of both an impairment and the lack of appropriate alternatives for managing such person's estate, requires the appointment of a conservator." K.S.A. 2020 Supp. 59-3051(g). The phrase "manage such person's estate" is defined as

> "making those determinations and taking those actions which are reasonably necessary in order for a person to receive and account for personal or business income, benefits and property, whether real, personal or intangible, and except for reasons of indigency, to purchase or otherwise obtain necessary goods or services, to pay debts and expenses, to sell, exchange or otherwise dispose of property, and to plan for future accumulation, conservation, utilization, investment, and other disposition of financial resources." K.S.A. 2020 Supp. 59-3051(h).

A conservatee may file a petition to restore his or her capacity. K.S.A. 59-3090. If the district court determines that good cause exists to warrant further proceedings on the petition, a hearing is held. K.S.A. 59-3090(c)(1). After the hearing on the petition, "if the court does not find, by clear and convincing evidence, that the . . . conservatee is impaired, the court shall order that the . . . conservatee is restored to capacity and shall proceed to terminate the . . . conservatorship." K.S.A. 59-3090(h).

There is no doubt that Colby suffers from a serious, ongoing impairment. Since his traumatic brain injury in July 2011, Colby has been evaluated by mental health professionals as having a major neurocognitive disorder resulting in impaired judgment and poor insight and an inability to make reasoned decisions about various matters, including his finances. He has been found to suffer from impulsivity, confusion, memory deficits, and poor impulse control, and he is verbally aggressive and uncooperative.

Since the accident Colby's parents have provided Colby with a home, paid the electric and cable TV bills, and provided health and auto insurance. They manage his monthly disability payments and provide him with $200 per week plus a credit card for groceries and gasoline for his truck, which belongs to his parents. Over the years since the accident, Colby has not improved in his ability to handle his own financial affairs. His mother testified that Colby needs someone to handle his disability paperwork, manage his finances, and pay his bills.

In opposing the conservatorship, Colby argues that he buys his own groceries and buys his lunches at a local fast-food restaurant. While his parents handle the payment of most of his expenses of daily living, he argues that he could pay them himself without their intervention.

Colby's testimony consisted of rambling and angry answers of a disturbed individual. He testified that he is a landowner with his "name written on four different separate quarters of ground." If relieved of the conservatorship he would

"move to the state of Colorado and selling everything here, moving out of this state, but I have to come back here to sue the sheriff mostly because he's a useless little turd, and then I'm gonna sue John Michael Tarbet because he damn near killed me and the sheriff watched the whole thing and musta thought it was a good joke, but that's why I call him a good joke. Lance Babcock. Ok, that's it."

These are apparently references to the ATV accident that led to Colby's head injuries. Colby testified, "I'm gonna sue the sheriff's department and I hope to get millions of dollars." The transcript of Colby's testimony is interspersed with numerous references to "(unintelligible)" and at one point an "(unintelligible rant about sheriff)."

Colby is equally unhappy with others in the community, including his prior guardian ad litem, Jessica Akers. "[T]hat lady . . . really screwed me over, she just left. She was guardian ad litem and she just quit because she's not worth a crap." Colby was also unhappy with his dentist, with whom a dispute resulted in "four or five other God damn cops show[ing] up." With respect to this latter incident, Colby testified:

"I went in there and he argued with me. And then somehow, what the hell difference does that make? I argue with everybody everyday. If I wanted to get into an argument I'd go argue with somebody. I am free to argue whenever the hell I want to."

At one point, Colby had to be transferred to the care of a different therapist after becoming verbally abusive. He had to be removed from the premises when he was cursing loudly and blocking the clinic's doorway.

Colby's parents are farmers. Since his accident, Colby occasionally drives the family's tractor, though not recently. Colby testified that his plan is to move to Colorado, buy a "piece of land in a pretty little spot," plant some grapes, and start a vineyard. There is nothing to indicate that Colby has any skills or experience in starting or operating a vineyard.

Colby argues that there was no evidence presented about the lack of appropriate alternatives to a conservatorship for managing his estate, as required by K.S.A. 2020 Supp. 59-3051(g). While the court did not make a specific finding on this, Colby raised no objection to this oversight. Thus we presume the court found all facts necessary to support its judgment. *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012). Moreover, Colby does not suggest any appropriate alternative to a conservatorship. To the contrary, the record supports the conclusion that there were no viable alternatives for managing Colby's estate other than through his parents as co-conservators of his estate. As described earlier in this opinion, it is clear that over the long run no person or entity could effectively deal with Colby in assisting him in the management of his affairs short of a conservatorship maintained by his parents—the only persons so vested in his well-being as to be willing and able to put up with the outward manifestations of his injury.

There are always those in society who undertake business ventures, make financial investments, enter into commercial transactions, or choose lifestyles that are based on ill-informed or naïve expectations or a lack of reasonable planning which have the potential—and sometimes the inevitable result—of dissipating such person's estate and jeopardizing such person's financial future. The law of conservatorship is not designed to rescue free spirits and improvident gamblers. Rather, it is designed to come to the rescue of persons whose decision-making on such matters is clouded or driven by a mental impairment that substantially affects their rational planning and decision-making ability.

Here, Colby has displayed an inability to make decisions that would allow him to "plan for future accumulation, conservation, utilization, investment, and other disposition of financial resources." K.S.A. 2020 Supp. 59-3051(h). We conclude that the evidence was sufficient to establish that Colby is an adult who suffers from a debilitating impairment for which he is in need of a conservator in order to manage his estate. The district court in its de novo review of the record of these proceedings did not err by keeping Colby's conservatorship in place.

*The Guardianship*

Colby's guardianship arises from the same July 2011 ATV accident that necessitated his conservatorship the following year.

Guardianship proceedings were not initiated until several years later when, on Friday, June 10, 2016, Colby's parents—in a new action separate from the conservatorship case—filed their petition for the appointment of a guardian for Colby.

The following Wednesday, June 15, 2016, the court held a hearing at which the court appointed Colby's parents to be his temporary guardians. There is no transcript of these proceedings. Colby did not attend the hearing, but Jessica Akers appeared as Colby's guardian ad litem. (There is no record of her being appointed guardian ad litem for Colby in this guardianship case, though she had been appointed to represent Colby in the conservatorship case.) The court appointed Colby's parents his temporary guardians, to "remain in effect until a final hearing is held or modified by this Court." The court found that "Colby Spencer needs to complete an evaluation; therefore, his parents need to have temporary powers to make sure the evaluation is completed."

Later that year, Colby's parents received evaluations of Colby from Compass Behavior Health dated December 9, 2016, and from Prairie View, Inc. dated December

9

21, 2016. Colby's parents did not provide these reports to the court until they were introduced into evidence at the final hearing in this matter in May 2019.

On January 16, 2017, Jessica Akers filed a motion in the conservatorship case for leave to withdraw as Colby's guardian ad litem. She refers to herself as Colby's guardian ad litem in both the conservatorship and the guardianship, though the record does not disclose that she was ever appointed Colby's guardian ad litem in this guardianship case. On January 24, 2017, the court granted Akers' motion, and she was relieved of her duties in both cases. No substitute guardian ad litem was appointed.

Nothing further happened in the guardianship case until November 8, 2018, when Colby submitted to the court a rather illegible handwritten document, which the court later construed as his request that the court terminate the guardianship. That document appears to state:

> "Terminate temporary order of guardianship. I am requiring a hearing. I would like this hearing to be soon. I am perfectly capable of running my own affairs.
> . . . .
> "I am going to have this mailed to Garry and Merlene Spencer.
> "Clint Floyd [the attorney previously representing Colby's parents] is also receiving a copy."

The court did not act upon Colby's request by issuing the mandatory orders under K.S.A. 59-3091(c).

On April 5, 2019, Colby submitted a similar handwritten request to terminate the conservatorship.

On April 9, 2019, Colby was personally served with a notice that the matter would be heard on May 16, 2019.

10

The following month, on May 13, 2019, Colby's parents filed their answer to Colby's request to terminate the guardianship and his conservatorship. They asked that the court not terminate the guardianship and conservatorship because Colby is in need of them continuing as co-guardians and co-conservators.

On May 16, 2019, Colby appeared in person and requested that the court appoint Cody Smith as his attorney in the matter. The court did so and continued the trial to May 29, 2019.

The trial took place before the district magistrate judge on May 29, 2019, after which the judge found that Colby was in need of a guardian and the court appointed Colby's parents to be his co-guardians.

Colby appealed to the district court judge, who conducted a de novo review of the record of the trial and found clear and convincing evidence that Colby was in need of a guardian. The court appointed Colby's parents to be his co-guardians.

Colby appealed to us. His first contention on appeal is that the guardianship is void for lack of due process. He acknowledges that he did not raise this issue below. He argues that he can assert the issue for the first time on appeal because it is necessary to prevent the denial of his fundamental rights. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 1178 (2009). Given the nature of the case and the rights involved, we will consider this claim.

The requirements for the appointment of a guardian are entirely statutory. K.S.A. 59-3050 et seq. We have unlimited review over issues of statutory interpretation. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

11

*Analysis: Due Process*

K.S.A. 59-3063 sets forth an extensive list of mandatory preliminary orders to be entered upon the filing of a petition for the appointment of a guardian for an impaired adult. A notice regarding these preliminary orders is required to be served on the proposed ward. K.S.A. 59-3063(a)(5); K.S.A. 59-3066. Here, no such preliminary orders were issued and no notice was served on Colby upon the filing of the petition.

K.S.A. 59-3063(a)(1) provides that the matter has to be set for trial between 7 and 21 days following the filing of the petition unless the proposed ward requests a jury trial, in which case the trial can be delayed up to 30 days after the proposed ward's jury demand. Colby's guardianship trial did not take place until almost three years after the filing of the petition. Moreover, the court never notified Colby that he was entitled to a jury trial on his parents' petition as required by the statute.

Rather than a timely trial on the parents' petition, the court held a hearing for the appointment of Colby's parents as temporary co-guardians. In their petition, the parents had not asked for the appointment of a temporary guardian for Colby. Nor did they file a separate petition under K.S.A. 59-3073(a) for the appointment of a temporary guardian. Such a petition would have required them to allege that it was their belief that "there may be an imminent danger to the physical health or safety of the proposed ward requiring immediate action to be taken to protect the proposed ward," and would have required them to specify "the factual basis upon which the petitioner alleges this imminent danger" and to identify the witnesses by whom these allegations could be proven. K.S.A. 2020 Supp. 59-3073(a)(3) and (4). No such allegation was made to invoke the court's power to appoint a temporary guardian. Nevertheless, the court appointed Colby's parents as his temporary guardians based on the fact that Colby "needs to complete an evaluation"— hardly the imminent danger contemplated by the statute for the appointment of a temporary guardian.

12

K.S.A. 2020 Supp. 59-3073(b)(3) provides that any order appointing a temporary guardian expires within 30 days following issuance of the order. The order can be extended beyond 30 days only upon the filing of a written request and a hearing to determine if such an extension is warranted. Here, contrary to K.S.A. 59-3073(b)(3), the court directed that the "temporary order [appointing Colby's parents temporary co-guardians] shall remain in effect until a final hearing is held or modified by this Court." (That, of course, did not happen until almost three years later.) Moreover, when the statutorily mandated maximum period for the temporary guardianship expired, the temporary guardians never sought an order extending it and the court never extended it.

Even if we assume for the sake of argument that Colby's parents were properly appointed his temporary guardians, Colby's parents continued to assert their authority over Colby after the temporary guardianship expired under the provisions of K.S.A. 59-3073, as if they had the power to do so. For example, in their answer to Colby's petition for termination of the guardianship, they admitted that they "cause[d] Colby to complete several evaluations." These included the evaluation at the Brookhaven Specialty Hospital in Tulsa on January 10, 2018, where Colby was admitted as a patient well after the maximum statutory period for the authority of the temporary guardians expired.

Based on this litany of procedural defects, Colby argues that the temporary order was either void at its inception or expired 30 days after it was entered. The appointment of temporary guardians did not conform to the statutes, and we agree with Colby that in any event the temporary guardianship expired 30 days after it was entered. But at that point there remained unresolved the underlying issue regarding the need for an ongoing guardian. The issue then becomes whether the district magistrate judge's decision—affirmed by the district court judge—was entered in violation of Colby's due process rights. Colby's parents argue in their appellate brief:

13

"It may be true that the temporary guardianship did not comply with the statutory scheme of the guardianship statute and in said event Colby's due process rights may have been violated. . . . [But] Colby's appeal is an appeal concerning the permanent guardianship. The voided temporary guardianship does not void the permanent guardianship; the Spencers' failure to comply with the guardianship statute as to the temporary guardianship is not an inference that the Spencers did not substantially comply with the statutory scheme of the guardianship statute as it relates to the permanent guardianship."

The statutory scheme for creating a guardianship calls for an accelerated disposition of the proceedings upon the filing of the petition. A lot of things have to happen quite quickly. The court must promptly appoint an attorney for a proposed ward who is not already represented, and the attorney must meet with the proposed ward at least five days before trial. Under K.S.A. 59-3064(a) and (c), upon the filing of the petition, the court must order an evaluation of the proposed ward, and the report of the evaluation must be filed with the court at least five days before trial. Under K.S.A. 59-3063(a)(1), the trial must take place between 7 days and 21 days following the filing of the petition, or within 30 days following a jury demand if one is made.

Given all the irregularities in these proceedings, and the fact that the trial on the petition did not occur until almost three years after the petition was filed, it is hard for us to characterize the ultimate disposition of this case being the product of substantial compliance with the statutory scheme.

But this does not end the analysis. In *State v. Hall*, 287 Kan. 139, 195 P.3d 220 (2008), our Supreme Court discussed a claimed violation of due process due to delays in the underlying proceedings but in a different context—the State's delay in pursuing a probation violation. There, the court stated: "The Due Process Clause imposes procedural and substantive due process requirements whenever the State deprives someone of liberty." 287 Kan. at 143. "Thus, because of the loss of liberty entailed, a person whose

14

probation is subject to revocation . . . is protected by due process rights and is entitled to a prompt revocation hearing after being arrested." 287 Kan. at 145. The court noted that past Kansas cases "measured the reasonableness of the delay by determining whether 'prejudice to the defendant is shown by the delay, or there is an indication that the violation has been waived by the government.' [Citation omitted.]" 287 Kan. at 145. But the court concluded that in the context of a delay in the execution of a warrant, "[w]e see no persuasive reason to create a different test for this circumstance than the prejudice test Kansas courts have utilized in other contexts." 287 Kan. at 154. In describing the delay necessary to produce a due process violation, the court quoted *Parham v. Warden*, 172 Conn. 126, 134, 374 A.2d 137 (1976): "'To establish that a delay has produced a denial of due process, the person arrested must show that actual significant prejudice to him has resulted.'" *Hall*, 287 Kan. at 155; see *Harris v. Day*, 649 F.2d 755, 761-62 (10th Cir. 1981).

The very nature of a guardianship for an impaired adult restrains the ward in the exercise of certain liberties that other adults naturally enjoy. When the proceedings that result in such a restraint of liberty are conducted in a manner contrary, in many respects, to our statutory framework, we must consider whether these irregularities prejudiced Colby. The test is whether we can declare that we are firmly convinced that the outcome of the proceedings would not have been different if these irregularities had not occurred. See *State v. Cooper*, 303 Kan. 764, 770, 366 P.3d 232 (2016).

Colby does not contend on appeal that he was prejudiced by the proceedings in this case. Nor do we find a basis for concluding the outcome would have been different if all statutorily mandated procedures had been followed.

The court failed to inform Colby at the outset of the case that he had the right to a jury trial. But given Colby's circumstances, we are firmly convinced that a jury would not have come to a conclusion different from that reached by the district magistrate judge and

15

the district court judge. Colby was given proper notice of the trial date when the case was finally tried. At the trial he was represented by counsel who cross-examined witnesses and argued on Colby's behalf. Colby testified on his own behalf at trial. The reports introduced into evidence show an impairment that existed at the time Colby's parents filed this action. Had the trial on the petition been held in a timely fashion, we find nothing to support a conclusion that the outcome would have been different than the ultimate outcome of the case. Had the proper statutory provisions been followed it is highly likely that the court would have found Colby in need of a guardian early on, and that guardianship would have persisted uninterrupted through October 2019 when the district court, in its de novo review of the proceedings before the district magistrate judge, confirmed that Colby was in need of a guardian.

Colby relies on *In re Guardianship and Conservatorship of Fogle*, 17 Kan. App. 2d 357, 361, 837 P.2d 842 (1992), as support for the notion that the notice provisions in K.S.A. 59-3010 [now K.S.A. 59-3063] were jurisdictional and that the failure to comply with the requirements of K.S.A. 59-3010 denied him due process and deprived the district court of jurisdiction over the proposed ward.

In *Fogle*, the court held a hearing in May 1990 and appointed a limited guardian and limited co-conservators for the 89-year-old Fogle. Prior to the hearing the court issued preliminary orders setting a hearing date, appointing an attorney for Fogle, and ordering Fogle to consult with his attorney. Fogle was sent notice of the hearing.

Later, in March 1991, the limited guardian moved the court to grant full powers of guardianship. The district court set the matter for hearing but did not issue to Fogle a notice to appear at the hearing, though Fogle's guardian ad litem notified him of the hearing. On the day of the hearing, the guardian ad litem went to Fogle's residence to pick him up for the hearing but Fogle refused to go, stating that he was expecting

16

Governor Finney to come to his house and he was going to stay home and wait for her. The court proceeded with the hearing and granted the guardian full powers.

On appeal, a panel of our court found that while the limited guardianship continued, the order converting the guardian's limited powers to full powers was void for failure to provide the statutorily mandated notice to Fogle of the March 1991 proceedings. 17 Kan. App. 2d at 362.

*Fogle* does not control. Unlike in *Fogle*, in which the ward was not provided the statutorily mandated notice of hearing, Colby was provided a proper notice of the trial and personally appeared on the appointed date when the court appointed counsel for him and continued the trial to May 2019. Colby attended the May 2019 trial and fully participated by testifying in opposition to the guardianship.

In spite of the many irregularities in these proceedings, in the end Colby was not denied due process of law.

*Analysis:  Substantial Evidence*

Colby contends that clear and convincing evidence does not support the finding that he needs a guardian. Clear and convincing evidence is necessary to support the appointment of a guardian. K.S.A. 2020 Supp. 59-3067(e)(1). Clear and convincing evidence is evidence sufficient to establish that the truth of the facts asserted is highly probable. *In re Adoption of C.L.*, 308 Kan. at 1278. In considering the sufficiency of the evidence, we do not reweigh the evidence or pass on the credibility of the witnesses. We will not disturb the district court's ruling on appeal if the evidence, viewed in the light favoring Colby's parents—the prevailing parties—supports the court's ruling. See *Gannon*, 298 Kan. at 1175-76.

K.S.A. 2020 Supp. 59-3067(e)(1) authorizes the appointment of a guardian for an adult with an impairment who is in need of a guardian. Such a person is defined in K.S.A. 2020 Supp. 59-3051(a) as one

"whose ability to receive and evaluate relevant information, or to effectively communicate desires, or both, even with the use of assistive technologies or other supports, is impaired such that the person lacks the capacity to meet essential needs for physical health, safety or welfare, and who is in need of a guardian."

The phrase "in need of a guardian" is further defined in K.S.A. 2020 Supp. 59-3051(f) as "a person who because of both an impairment and the lack of appropriate alternatives for meeting essential needs, requires the appointment of a guardian." Under K.S.A. 2020 Supp. 59-3051(i) the phrase "meet essential needs for physical health, safety or welfare" means

"making those determinations and taking those actions which are reasonably necessary in order for a person to obtain or be provided with shelter, sustenance, personal hygiene or health care, and without which serious illness or injury is likely to occur."

The case was initially tried before the district magistrate judge who found that Colby was in need of a guardian because he is an impaired adult who is unable to meet his essential needs for his physical health, safety, and welfare. The court found that Colby has a major neurocognitive disorder and behavioral disturbance that results in impaired judgment and poor insight. Among other findings, the court found that Colby lacks the capacity to make reasonable decisions about his health care. The court also expressed concern over Colby's physical deterioration and hygiene. Moreover:

"This court is concerned that Colby will become angry with someone who does not understand his condition and the court is concerned the outcome of such an event could place Colby at risk of legal action or physical harm."

18

The trial proceedings were reviewed on appeal by the district court judge who concluded that the district magistrate judge "was correct in her decision." The district court judge found that "Colby is not able to meet his essential needs for physical health, safety and welfare" and is in need of a guardianship. We find substantial support in the record for these findings, and the court did not err in concluding that Colby is in need of a guardianship.

Colby's mother testified at the trial that Colby does not see a doctor frequently but has to see his dentist at least four times a year. She did not think Colby was capable of keeping appointments and that she needed to remind him of appointments and sometimes to provide him with a ride. Regarding Colby's psychological care, she stated: "I think that he could benefit by going to Compass Behavioral Health or someone to visit with, but he doesn't keep those appointments."

According to Colby's mother, when Colby was originally diagnosed with intermittent explosive behavior and depression, he was prescribed a mood enhancer drug "[b]ecause Colby's really angry sometimes. And so basically it was just that antidepressant type medicine, for the most part just to put him on an even keel everyday." Though Colby is not currently taking medications, "[h]e's been to some facilities that say if he would take some medicine that he might be a little more, less angry."

Colby's parents provide him with a house to live in rent-free, and they also supply his utilities and other basic expenses. Colby's only occupation has been farming, but he now seldom helps out on the family farm. His mother testified, "I'd like him to work for us. That's usually not possible for him." Colby has issues with personal hygiene which have not improved over the years since the petition was filed. Colby purchases his own groceries but charges them to his parents. According to his mother, "I think he lives a lot on granola bars."

Colby testified that he takes medications when they are prescribed for him. But "I'm not gonna take any [medication] that some nuthouse doctor gave me because he didn't even see me for 10 mins and decided I need something for antipsychotic something or other guy didn't even know me except for I sat in there for 10 minutes. So I ain't takin that, I'm not going to."

The psychological reports and evaluations admitted into evidence reported that Colby does not initiate activities of daily life and has poor personal hygiene and grooming unless prompted. The report from Compass opined that Colby is unable to care for himself. Prairie View commented that Colby has impaired judgment and poor insight, is currently receiving support for his activities of daily living, lacks the capacity to make reasoned decisions about his health care, and is not able to care for himself without assistance. Brookhaven Hospital opined that Colby needs a structured environment and a routine schedule on account of his memory deficits, paranoia, and aggressive behavior. Dr. Bret Holman recounted in an email to Colby's mother how Colby was agitated and aggressive during an office visit, yelling profanities in the waiting room with children around to the extent that Dr. Holman had fears for the safety of his staff.

We noted earlier Colby's testimony about his dealings with others in the community, such as the incidents with his guardian ad litem, his dentist, and his therapist. In the incidents with his guardian ad litem, the police had to be called to the lawyer's office on two occasions. In the incident with his therapist, he had to be removed from the premises when he was cursing loudly and blocking the clinic's doorway. As he said, when describing an incident with his dentist, "[W]hat the hell difference does that make? I argue with everybody everyday. If I wanted to get into an argument I'd go argue with somebody. I am free to argue whenever the hell I want to."

20

Without a guardianship, Colby has expressed his intention to move away and start a vineyard, a venture for which he has no apparent skill or experience. In doing so, he would be leaving what appears to be his only support system. He would no longer have a home to live in free of charge. He would no longer have the help of his mother on matters of medical, dental, and other appointments. She would not be available to pick up after him on a regular basis. He would be on his on when it comes to matters of personal hygiene or managing his neurological disorder.

With respect to the necessity to show that there is no viable alternative to a guardianship, we refer to our earlier discussion of this issue in the context of the conservatorship. Colby does not suggest any appropriate alternative to a guardianship, and we conclude that based on the evidence there is none. Given Colby's mental state, we find it hard to believe that anyone short of his parents as co-guardians would be willing and able to provide Colby with meaningful, effective assistance given his angry, defiant, and oppositional mental state.

The district court did not err in establishing a guardianship and a conservatorship for Colby and appointing his parents as his co-guardians and co-conservators.

Affirmed.